512 S.E.2d 873

**In re the Petition of Robert JEFFRIES and Judy Jeffries, his wife, for the adoption of Rebecca L. Jeffries, an infant.**

No. 25198.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 10, 1998.

Decided Dec. 14, 1998.

---

D. Clinton Gallaher, IV, Esq., Fayetteville, West Virginia, Attorney for Appellants Robert and Judy Jeffries.

C. Elton Byron, Jr., Esq., Abrams & Byron, Beckley, West Virginia, Attorney for Appellee Timothy L. Davis.

Kyle G. Lusk, Esq., Beckley, West Virginia, Attorney for Appellee Tonya Jeffries.

STARCHER, Justice:

In this adoption case we are asked to determine whether the Circuit Court of Fayette County, in a final order dated December 11, 1997, erred in its holding that the biological father of a child did not abandon the child. The appellants, the individuals who have cared for the child since her birth and who are seeking to adopt her, allege that the appellee, the child's father, has failed to provide any financial support for the child since she was born 2½ years ago. Furthermore, the appellants contend that the appellee father never attempted to visit or otherwise communicate with the child prior to their filing of the adoption petition.

*W.Va.Code,* 48–4–3c [1997] sets forth factors whereby a court must presume that a parent has abandoned a child, and after reviewing the record, we conclude that those factors were met in this case. Accordingly, as set forth below, we hold that the circuit court erred in finding the appellee father did not abandon his child. We reverse the circuit court's December 11, 1997 order and remand the case for further proceedings.

I.

*Facts and Background*

This case concerns the adoption of Rebecca Lynn Jeffries, a child born on April 23, 1996. The appellants are the individuals who seek to adopt the child, Robert and Judy Jeffries (who are unrelated to the child, though they share the same surname). The appellee,

Timothy L. Davis, is the natural father of Rebecca. Mr. Davis resides in North Carolina.

The record indicates that Rebecca's biological mother, Tonya Jeffries, had a relationship with appellee Davis while living in North Carolina. At an unknown time, Ms. Jeffries terminated the relationship and moved to West Virginia to live with her grandmother.

On February 27, 1996, Ms. Jeffries attempted to contact the appellee by telephone at his mother's house in North Carolina. During this telephone call, Ms. Jeffries spoke with the appellee's mother, Ramona Davis, and stated that she was pregnant with the appellee's child. It appears from the record that appellee Davis was informed shortly thereafter by his mother that Ms. Jeffries was pregnant with his child.[1] However, the appellee testified that he did not believe he was the father of the child.

The appellee testified that he contacted Ms. Jeffries by telephone shortly before Rebecca's birth. In this conversation, the appellee testified that Ms. Jeffries told the appellee she thought the child was his, but if he wanted to see the child, he would "have to go to court and fight her in court."

At an undetermined time before Rebecca's birth, Ms. Jeffries moved into the house of the appellants, Robert and Judy Jeffries. The appellants offered care and assistance to Ms. Jeffries during her pregnancy, and she moved out shortly before the birth. The day after Rebecca was born in April 1996, the appellants took her home from the hospital, and she has continuously been in the sole custody of the appellants since that date.[2]

After Rebecca's birth, appellee Davis made no attempt to locate her. He testified that he made no effort to visit or otherwise com-

---

1. The appellee testified that during a visit with his mother she informed him of Tonya Jeffries' phone call. The appellee also testified that Tonya Jeffries had called, not once, but three times.

2. An adoption home study report dated September 26, 1997, states:
 It is obvious that Robert and Judy Jeffries are physically and emotionally stable people and that they love Rebecca and that she returns that love. Since Rebecca's birth, she has been in their loving care, and as a result of that

care, has responded as a happy and thriving child. The natural father, Timothy Davis, has abandoned Rebecca and although given many opportunities, has never financially or emotionally, shown any form of communication or love to his child, nor to the mother of Rebecca, Tonya Jeffries.
 I strongly suggest that the best interests of Rebecca Lynn Jeffries would be served by the adoption of her by Robert and Judy Jeffries.

municate because he "didn't know where she was." The appellee indicated that during this period he moved and lost Ms. Jeffries' telephone number, and said that while he had visited with Ms. Jeffries' grandmother at her West Virginia residence, he could not remember the way to get there.

Appellant Robert Jeffries testified that in July 1996 he telephoned the appellee. He stated that he told the appellee of Rebecca's birth, and asked the appellee to give his consent to allow the appellants to adopt Rebecca. The appellee said "he'd have to think about it."

Appellee Davis testified that he first learned of Rebecca's birth in August 1996, when a lawyer for the appellants mailed a letter to him in North Carolina. In the letter, the lawyer enclosed a form for the appellee to sign, through which he would give his consent to Rebecca's adoption by the appellants. The appellee refused to sign the form.

Three months later, the appellee had a blood test completed to determine paternity. In December 1996, the test results were returned confirming that the appellee was the natural father of Rebecca. The appellee filed a "Petition to Establish Paternity and Custody" in the circuit court on April 8, 1997, nearly a year after Rebecca's birth.[3]

On September 17, 1997, the appellants filed the instant petition for the adoption of Rebecca. The natural mother, Ms. Jeffries, consented to the adoption. The appellants alleged in their petition that the natural father, appellee Davis, had abandoned the child pursuant to *W.Va.Code,* 48–4–3c [1997] because he (1) had failed to financially support the child, and (2) failed to visit or communicate with the child.

An evidentiary hearing was held on October 14, 1997. At that hearing, the appellee admitted that he had never done anything to financially support Rebecca.[4] Additionally, he admitted he had never visited or commu-

nicated with Rebecca. The appellee testified that he had a lawyer, and knew that the appellants had a lawyer—still, he admitted he never tried to communicate through the lawyers to pay any child support to the appellants, or to ask where Rebecca was located so that he could arrange a visit or otherwise communicate with her.

In a final order dated December 11, 1997, the trial court found that the appellee was not aware of Rebecca's birth or her place of residence. The trial court further found that the appellee "took immediate action" to have a blood test performed when he received the letter from the appellants' attorney, and that he filed proceedings to get custody after receiving a positive test result. The court concluded that appellee Davis had made a "reasonable effort to try to determine both the location of this child and to make visitation with the child[.]"

The trial court held that the appellants had failed to prove the appellee abandoned Rebecca. Accordingly, the trial court denied the petition for adoption.

This appeal of the circuit court's order followed.

## II.

### *Standard of Review*

■ "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syllabus Point 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996).

## III.

### *Discussion*

The appellants contend that appellee Davis does not have the right to custody of his

---

3. At oral argument before this Court, counsel for Mr. Davis admitted that this 4–month delay was the result of an oversight solely on counsel's part. Accordingly, in this case we have omitted from our consideration the filing date for the custody petition.

4. During oral arguments before this Court on November 10, 1998, counsel for the appellee admitted that the appellee has still made no attempt to financially support the child, nor has he placed any money in escrow or made other arrangements to support and maintain the child.

daughter Rebecca, and contend that the circuit court erred in its determination that appellee Davis did not abandon her. They argue that the appellee failed to try to track down the child after first learning that Ms. Jeffries was pregnant, and later after learning of her birth; failed to financially support the child, even after learning the child was his; and failed to communicate with the child for periods in excess of 6 months.

Appellee Davis argues that he did not abandon his daughter. He takes the position that once he learned the appellants were trying to adopt his purported daughter, he initiated a blood test to see if he really was the natural father. When the test confirmed he was the natural father, he filed legal proceedings to get custody. The appellee argues that he never visited with Rebecca because he could not locate her, and never realized he could provide financial support for his daughter through his attorney.

■ We have often stated that a biological parent has a right to the custody of his or her child. In the Syllabus to *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969), we stated that:

A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.

*In accord*, Syllabus Point 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975). While there may be situations where the welfare of the child and the natural parent are in conflict, "there is a strong presumption that the welfare of the child is well protected when he is in the custody of an unoffending

natural parent ." *Honaker v. Burnside*, 182 W.Va. 448, 451, 388 S.E.2d 322, 324 (1989), *citing Hammack*, 158 W.Va. at 347, 211 S.E.2d at 121.

■ However, as stated in *State ex rel. Kiger, supra*, abandonment of a child voids the presumption that a biological parent is fit to have custody. We have defined abandonment to mean "any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all claims to the child." *Matter of Adoption of Schoffstall*, 179 W.Va. 350, 352, 368 S.E.2d 720, 722 (1988) (citations omitted). We gave a broad outline of what constitutes abandonment in the case of *In re Harris*, 160 W.Va. 422, 428, 236 S.E.2d 426, 430 (1977):

Where a father abandons his children, provides no support and maintenance, does not visit the children, and does not in any other reasonable way, given his position in life and the opportunities for the exercise of his parental rights, exercise the authority or undertake the responsibilities of a parent, . . . we would not be concerned with the father's protectable interest because he would have waived such interest by abandonment.

Similarly, *W.Va.Code*, 48–1–1(a) [1997] defines abandonment to mean

. . . any conduct by the birth mother, legal father, determined father, outsider father, unknown father or putative father that demonstrates a settled purpose to forego all duties and relinquish all parental claims to the child[.]

In this case we are guided by *W.Va.Code*, 48–4–3c(a) [1997], which essentially codifies *In re Harris* and *Schoffstall*, and provides clear standards for determining abandonment.[5] *W.Va.Code*, 48–4–3c(a) [1997] sets forth conduct on the part of the parent that, if found, requires a circuit court to presume that a parent has foregone all parental duties and abandoned a child over the age of 6

---

**5.** The appellee's conduct in dispute in this case occurred before and after the July 11, 1997 effective date of *W.Va.Code*, 48–4–3c. The standards set forth in *W.Va.Code*, 48–4–3c establish clear guidelines for establishing abandonment, but we believe these standards are merely a codification of our existing case law.

Accordingly, while in this case we hold that the appellee's actions establish abandonment under *W.Va.Code*, 48–4–3c(a), we believe that the circuit court could have found abandonment under existing case law as well.

months.[6] The statute states, in pertinent part:

(a) Abandonment of a child over the age of six months shall be presumed when the birth parent:

(1) Fails to financially support the child within the means of the birth parent; and

(2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child: Provided, That such failure to act continues uninterrupted for a period of six months immediately preceding the filing of the adoption petition.

\* \* \*

(d) Notwithstanding any provision in this section to the contrary, any birth parent shall have the opportunity to demonstrate to the court the existence of compelling circumstances preventing said parent from supporting, visiting or otherwise communicating with the child: Provided, That in no event may incarceration provide such a compelling circumstance if the crime resulting in the incarceration involved a rape in which the child was conceived.

 We recently made clear that if an unwed father demonstrates a commitment to the responsibilities of parenthood, then the unwed father has a right to, at a minimum, establish a parent-child relationship with a child. In Syllabus Point 4 of *Kessel v. Leavitt,* 204 W.Va. 95, 511 S.E.2d 720 (1998), we stated:

The instant a child is born, both unwed biological parents have a right to establish a parent-child relationship with their child. To preserve his parental interest vis-a-vis his newborn child, an unwed biological father must, upon learning of the existence of his child, demonstrate his commitment to assume the responsibilities of parenthood by coming forward to participate in the care, rearing, and support of his newborn child and by commencing to establish a meaningful parent-child relationship with his child.[7]

 However, "[s]uperior to any rights of parents to the custody of their own children . . . is the overriding consideration of the child's best interests. Thus, the natural right of parents to the custody of their children is always tempered with the courts' overriding concern for the well-being of the children involved." *Kessel,* 204 W.Va. at 175, 511 S.E.2d at 799. As we stated in Syllabus Point 7 of *Matter of Brian D.,* 194 W.Va. 623, 461 S.E.2d 129 (1995), "Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child." Accordingly, in an adoption action where it is

6. *W.Va.Code,* 48-4-3c(b) [1997] defines the conduct whereby a biological father can be found to have abandoned a child under the age of 6 months. It states:

(b) Abandonment of a child under the age of six months shall be presumed when the birth father:

(1) Denounces the child's paternity any time after conception;

(2) Fails to contribute within his means toward the expense of the prenatal and postnatal care of the mother and the postnatal care of the child;

(3) Fails to financially support the child within father's means; and

(4) Fails to visit the child when he or she knows where the child resides: Provided, That such denunciations and failure to act continue uninterrupted from the time that the birth father was told of the conception of the child until the time the petition for adoption was filed.

In this case, because Rebecca was 1½ years old at the time the petition for adoption was filed, we do not consider this *Code* section.

7. In discussing the constitutional dimension of parenthood, we have similarly stated that:

Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. *When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection* under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution.

Syllabus Point 2, *State ex rel. Roy Allen S. v. Stone,* 196 W.Va. 624, 474 S.E.2d 554 (1996) (emphasis added).

alleged that a biological parent has abandoned a child, it is "highly relevant for the circuit court to consider ... whether the [biological parent] ... was dilatory in grasping the opportunity to assert his parental rights and responsibilities." *State ex rel. Roy Allen S. v. Stone,* 196 W.Va. 624, 638, 474 S.E.2d 554, 568 (1996).

The record in this case indicates that appellee Davis did not demonstrate his commitment to assume the rights and responsibilities of parenthood. We cannot, on this record, conclude that the appellee did anything to participate in the care, rearing, and support of his child.

 For a natural parent to avoid the presumption that he or she has abandoned a child who is over the age of 6 months, *W.Va. Code,* 48–4–3c(a)(1) [1997] requires the parent to financially support the child, within the means of the parent. Furthermore, *W.Va. Code,* 48–4–3c(a)(2) [1997] requires the parent to visit or otherwise communicate with the child when the parent: (1) knows where the child resides; (2) is physically and financially able to do so; and (3) is not prevented by the person or authorized agency having the care or custody of the child. If there is evidence in a subsequent adoption proceeding that the natural parent has both failed to financially support the child, and failed to visit or attempt to otherwise communicate with the child in the 6 months preceding the filing of the adoption petition, a circuit court shall presume the child has been abandoned.

 It is undisputed in this case that since the birth of Rebecca in April 1996 until today, over 2½ years later, appellee Davis has failed to provide any financial support for his daughter. There is no evidence in the record that the appellee was unable to provide support. Instead, appellee Davis testified that he did not provide support for his daughter, first, because he *did not know where she was* located, and second, because he did not realize he could make arrangements through his attorney or the appellants' attorney to provide support.

 Furthermore, it is undisputed that appellee Davis failed to visit or otherwise communicate with the child for a continuous period of 6 months immediately preceding the filing of the adoption petition. The trial court found that the appellee did not know where the child resided, and was therefore prevented from making contact with his daughter. We disagree with this reading of the record.

The evidence in this case indicates that appellant Robert Jeffries contacted the appellee in July 1996, 3 months after Rebecca's birth. Mr. Jeffries testified that in that conversation the appellee said he would "think about" allowing the Jeffries to adopt his daughter. However, we find nothing in Mr. Jeffries' or the appellee's testimony to indicate that the appellee asked to visit or otherwise communicate with his daughter, or to indicate the Jeffries in any way prevented any visitation or communication.

Appellee Davis was again made aware of the appellants' desire to adopt Rebecca when the appellants' attorney mailed him a letter in August 1996. In response to this letter, the appellee hired a lawyer in North Carolina who initiated a blood grouping analysis to see if the appellee was the natural father. This blood testing took place 3 months later, and appears to have involved taking blood samples from Rebecca. While the parties' attorneys were able to locate Rebecca and arrange to have blood taken, we see nothing in the record to suggest the appellee made any reasonable attempt to visit or communicate with his daughter, ostensibly because he "didn't know where she was."

The blood test results were completed in December 1996, and indicated that appellee Davis was, in fact, the natural father. Between that time and the evidentiary hearing before the trial court in October 1997, 10 months later, the record again reveals the appellee made no efforts to visit or otherwise communicate with his daughter. The only action taken was that the appellee's attorney filed a petition for custody in April 1997.[8]

---

8. *W.Va.Code,* 48–4–3c(a)(2) requires a biological parent to "visit or otherwise communicate" with a child to avoid the presumption the child has

been abandoned. We do not believe that initiating litigation against the custodians of the child, albeit for a proper purpose, can be construed as

 On this evidence, we believe that the trial court erred in its conclusion that the appellee tried but was unable to determine the location of the child and to make arrangements for visitation. While the appellee may not have known where his child was specifically located at the time of her April 1996 birth, we see nothing in the record showing that the appellee himself ever tried to determine her whereabouts in the 18 months preceding the October 1997 hearing. We therefore cannot agree with the trial court's finding that the appellee's filing of proceedings to determine the custody of the child satisfies the requirement in *W.Va.Code*, 48–4–3c(a)(2) that a birth parent "visit or otherwise communicate" with a child.

 "The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof." Syllabus Point 6, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973). We believe that clear, cogent and convincing proof exists in the record that the appellee has wholly failed to provide financial support for his daughter, and that the appellee failed, for a continuous period in excess of the 6 months preceding the filing of the adoption petition, to visit or otherwise communicate with his daughter when he could have reasonably learned where she resided, was not physically or financially prevented from doing so, and was not prevented by the Jeffries from doing so.[9]

Accordingly, we conclude that trial court's findings were clearly erroneous, and must be reversed.

### IV.

#### *Conclusion*

For the foregoing reasons, the circuit court's December 11, 1997 order is reversed and this case is remanded for further proceedings.

Reversed and Remanded.

parental visitation or communication. The statute focuses on whether a biological parent has attempted to maintain a parent-child relationship—not whether the parent has attempted to assert his or her natural right to physical custody of the child.

Chief Justice DAVIS and Justices WORKMAN, MAYNARD and McCUSKEY joined in the Opinion of the Court.

Justice McGRAW did not participate in the decision of this case.

9. *W.Va.Code*, 48–4–3c(d) [1997] states that "the existence of compelling circumstances preventing said parent from supporting, visiting or otherwise communicating with the child" can be considered in determining whether a biological parent has abandoned a child. The appellee has not alleged any compelling circumstances in this case.