IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2023 Term

_____

No. 21-0766

_____

FILED
November 3, 2023
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE ADOPTION OF R.L.

_____

Appeal from the Circuit Court of Wayne County
The Honorable Jason J. Fry, Judge
Case No. CC-50-2021-A-15

REVERSED AND REMANDED
WITH DIRECTIONS

_____

Submitted: September 6, 2023
Filed: November 3, 2023

Noel M. Olivero, Esq.                          Respondent Father J.L.
Sammons, Olivero & Paraschos              Self-represented Litigant
Huntington, West Virginia
Counsel for Petitioner Stepfather
C.S. and Petitioner Mother E.S.

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.     "'In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review.  We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a *de novo* review.'  Syllabus point 2, *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997)."  Syl. Pt. 1, *In re Adoption of Jon L.*, 218 W. Va. 489, 625 S.E.2d 251 (2005).

2.     The language of West Virginia Code section 48-22-306(a)(2) (2015) requiring a birth parent to "visit or otherwise communicate with the child when he or she knows where the child resides" does not preclude a finding that a birth parent has abandoned a child when the evidence shows that the birth parent had the ability to ascertain knowledge of the child's whereabouts but chose not to do so.

**WOOTON, Justice:**

Petitioner Mother E.S.[1] and Petitioner Stepfather C.S. (collectively "Petitioners") appeal the order of the Circuit Court of Wayne County, West Virginia, denying their petition to allow Petitioner Stepfather to adopt the minor child, R.L.[2] Respondent Father J.L., the child's biological father, contested the adoption, thus requiring the circuit court to analyze whether Respondent Father abandoned R.L. under West Virginia Code section 48-22-306 (2015).[3] The circuit court concluded that it could not find that Respondent Father abandoned the child because section 48-22-306(a)(2) permits a finding of abandonment only where the parent "fails to visit or otherwise communicate with the child when he or she knows where the child resides," and Respondent Father did not know where the child resided at the time the adoption petition was filed or in the preceding six months. *See id.*

Upon review of the arguments, the record, and the relevant law, we conclude that West Virginia Code section 48-22-306(a) does not preclude a finding of abandonment in a case where the birth parent has the ability to ascertain the child's whereabouts during

---

[1] Consistent with our practice in cases involving sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015).

[2] *See* W. Va. Code § 48-22-116 (2015) (defining "stepparent adoption" as "an adoption in which the petitioner for adoption is married to one of the birth parents of the child or to an adoptive parent of the child.").

[3] *Id.* § 48-22-306(a) is set out *infra* in full.

1

the relevant time frame but willfully fails to do so. Accordingly, we reverse the circuit court's order denying the adoption petition and remand this matter for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

R.L. was born in September 2010 to Petitioner Mother and Respondent Father. At the time, Respondent Father was not listed on the child's birth certificate, but paternity was established during family court proceedings in 2012-2013.[4] R.L. has never resided with Respondent Father, but has resided continuously with Petitioner Mother since the time of her birth. Moreover, Petitioner Mother and Petitioner Stepfather married in 2011, and it is undisputed that R.L. has resided continuously with both Petitioners since she was approximately two months old.

---

[4] It appears there were two separate but parallel proceedings, both of which occurred while Respondent Father was incarcerated. In August 2012, Respondent Father filed a Petition for Support and/or Allocation of Custodial Responsibility, and the Bureau for Child Support Enforcement ("BCSE") filed a Complaint for Paternity.

In Respondent Father's action, the Family Court of Jackson County entered a Final Order on October 4, 2012, allocating all custodial responsibility to Petitioner Mother and setting Respondent Father's child support obligation at $0 per month due to Respondent's Father's incarceration. In the BCSE's action, the family court entered a final order on February 1, 2013, concluding that Respondent Father was the biological father of R.L., as confirmed by the results of a paternity test performed in March 2011. The family court reiterated in its order that, during Respondent Father's incarceration, his child support obligation was to be set at $0 per month.

Respondent Father was intermittently incarcerated during much of R.L.'s young life. The record lacks clarity as to the specific periods of incarceration and release or the reasons therefor, but we can glean a rough timeline from a review of the entire record. First, Respondent Father testified that he was on parole for some undefined period in 2013 but was then reincarcerated. It is apparent that he was released on temporary furloughs in 2015,[5] because during that time he filed a Petition for Modification of the Family Court of Jackson County's October 4, 2012, order allocating custodial responsibility to Petitioner Mother. The family court entered a temporary order granting Respondent Father supervised visitation at the paternal grandmother's home and set a review hearing for early 2016. By the time of the review hearing, Respondent Father had been transferred to a different correctional facility that did not provide for the temporary furloughs, causing the family court to dismiss the Petition for Modification and order that Respondent Father be permitted to file a new petition in the future upon his release from incarceration.

It appears that Respondent Father was again paroled in late 2016 or early 2017. Once again, while it is unclear when he was released, he testified below that he was not incarcerated for "the majority of 2017"[6] but that he returned to prison in September

---

[5] The record does not clarify why Respondent Father was temporarily released from incarceration, but it appears that it was related to some form of work-release.

[6] At no point during that period of release did he seek modification of the custodial order.

3

2017.[7] Finally, Respondent Father testified that he was paroled again in December 2018 and remained out of prison until he discharged his parole in early 2020.

Shortly after his release in December 2018, Respondent Father had a chance visit with R.L. when the child was visiting her paternal grandmother on New Year's Eve 2018 and/or New Year's Day 2019. The evidence was undisputed that the visit was unplanned and occurred only because Respondent Father happened to be at the grandmother's home.[8] He testified that he took R.L. to Walmart and bought her a belated Christmas gift. It is undisputed that this is the last time Respondent Father visited or had any contact with R.L.

In April 2021, Respondent Father filed a second petition for modification of the 2012 custodial order. There are no documents pertaining to this petition in the record save the May 5, 2021, order dismissing it without prejudice. The only finding contained in that order states: "the [c]ourt finds that the petition fails to state a significant change in

---

[7] Respondent Father testified that after this reincarceration, he sent R.L. a single letter in the summer of 2018 containing a number of drawings he had made.

[8] Petitioners testified below regarding their lack of knowledge about this visit. They were both unaware that Respondent Father would be at the grandmother's home at the time. Petitioner Mother testified that she would not have permitted the visit to occur without "some discussion" beforehand, while Petitioner Stepfather testified that had he known Respondent Father would be at the home, he would not have permitted the visit. In any case, the visit occurred without incident.

4

circumstances that would warrant a modification under the West Virginia code." Respondent Father did not appeal that order.

Thereafter, in June 2021, Petitioners filed the underlying petition for adoption in the Circuit Court of Wayne County, West Virginia, seeking to allow Petitioner Stepfather to adopt R.L. Respondent Father contested the adoption, thus requiring the circuit court to determine whether Respondent Father had abandoned R.L. as set forth in West Virginia Code section 48-22-306. The matter proceeded to a hearing before the court spanning two days, July 20 and July 23, 2021, during which the court heard the testimony of Petitioners, Respondent Father, and the paternal grandmother. In addition to the facts set out above, Respondent Father conceded in his testimony that he had provided no financial support for R.L. from the time of her birth, even though he had means to do so after his release from incarceration in 2018 when he twice had gainful, full-time employment paying $20 per hour.

For purposes of this appeal, the primary point of contention below stemmed from Respondent Father's assertion that he did not know where R.L. resided in the six months preceding the filing of the adoption petition, and that the last time he knew the child's address was in 2018. In this regard, Petitioners conceded that they had relocated from Ravenswood, Jackson County, West Virginia, to Ceredo, Wayne County, West Virginia, in October 2020, and further conceded that they did not inform Respondent Father of their relocation. However, both Petitioners and Respondent Father testified that

5

Respondent Father had their telephone number—just as he had for the preceding ten years—and that he had, in fact, used that number to contact them days before the July 20, 2021, adoption hearing.[9]

Ultimately, on September 17, 2021 the circuit court entered an order denying the petition for adoption. In that order the court found that R.L. had resided continuously with Petitioners for the span of her life, that Petitioner Stepfather was of good moral character and a fit and proper person to adopt the child, and that he had been the child's psychological father since 2012. The circuit court further intimated its belief that granting the adoption would be in R.L.'s best interest. However, the court concluded that it could not grant the adoption because, while it could readily find that Respondent Father failed to financially support the child, it could *not* find that Respondent Father "fail[ed] to visit or otherwise communicate with the child when he . . . [knew] where the child reside[d]" because the evidence showed that he did not know the child's address at the time the adoption petition was filed or in the preceding six months. The circuit court explained that based on the language contained in the relevant statute, section 48-22-306(a)(2) precluded

---

[9] Respondent Father did not request to speak to R.L. at the time of that phone call, nor is there evidence that he had ever attempted to communicate with the child via telephone in the years prior.

the court from finding abandonment and thus precluded it from granting the petition for adoption. Petitioners now appeal that order.[10]

## II. STANDARD OF REVIEW

In adoption proceedings, the Court has set forth the following standard of review:

> "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syllabus point 2, *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

Syl. Pt. 1, *In re Adoption of Jon L.*, 218 W. Va. 489, 625 S.E.2d 251 (2005). With this standard in mind, we proceed to address the arguments on appeal.

## III. DISCUSSION

Petitioners challenge the circuit court's conclusion that it could not find that Respondent Father abandoned R.L. pursuant to West Virginia Code section 48-22-306 because Respondent Father did not know where the child resided.[11] Specifically, they

---

[10] This Court received briefing and argument only from Petitioners. Respondent Father filed no responsive pleading, despite having been served a Notice of Intent to Sanction on May 31, 2022.

[11] There was also some discussion in Petitioners' brief regarding whether Respondent Father's April 2021 petition for modification constituted an attempt to

7

argue that Respondent Father had the ability to ascertain the child's residence at any time by simply calling them on the phone but failed to do so at any point. Accordingly, Petitioners contend that the requirement in section 48-22-306(a)(2) that the birth parent "know" where the child resides should not operate to thwart a finding of abandonment where the birth parent has remained willfully ignorant of the child's whereabouts. We agree.

To reiterate, the crux of this case is whether the circuit court erred in concluding that it was precluded from finding abandonment because Father did not know where the child resided, without any consideration as to whether Father *could* have

communicate with the child for purposes of an abandonment analysis under West Virginia Code section 48-22-306. This Court has previously explained that

> [w]e do not believe that initiating litigation against the custodians of the child, albeit for a proper purpose, can be construed as parental visitation or communication. The [abandonment] statute focuses on whether a biological parent has attempted to maintain a parent-child relationship—not whether the parent has attempted to assert his or her natural right to physical custody of the child.

*In re Jeffries*, 204 W. Va. 360, 367 n.8, 512 S.E.2d 873, 880 n.8 (1998); *see also In re Adoption of H.G.*, 246 W. Va. 105, 116-17, 866 S.E.2d 170, 181-82 (2021) (concluding that birth mother's filing a petition to modify a guardianship order, and failing to pursue it, was insufficient to thwart a finding of abandonment). *In re Jeffries* dealt with a petition for custody, so we have no trouble extending the logic employed there to the instant petition to modify a custodial order. As explained in *In re Jeffries*, the critical issue is whether the biological parent has attempted to maintain a relationship with the child. Here, the evidence is undisputed that Respondent Father did not do so. Accordingly, we give no weight to his April 2021 petition for modification of a custodial order.

8

ascertained that information. Abandonment determinations in adoption proceedings are governed, in part, by West Virginia Code section 48-22-306, which provides, in relevant part:

> (a) Abandonment of a child over the age of six months shall be presumed when the birth parent:
>
> > (1) Fails to financially support the child within the means of the birth parent; and
> >
> > (2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child: Provided, That such failure to act continues uninterrupted for a period of six months immediately preceding the filing of the adoption petition.

*Id*. § 48-22-306(a). As we have explained, in order to find abandonment, "the plain language of the statute requires the failure of the child's birth parent to (1) financially support the child within his or her means, and (2) visit or communicate with the child when the birth parent knows where the child resides, is physically and financially able to do so, and has not been prevented from doing so, for a period of six months prior to the filing of the adoption petition." *In re Adoption of H.G.*, 246 W. Va. at 114, 866 S.E.2d at 179.

The circuit court determined that the first prong of the statute had been met insofar as Respondent Father conceded below that he failed to provide R.L with any financial support during her lifetime, despite having means to do so. *See id*. The record amply bears this out as Respondent Father admitted as much below, and accordingly we

9

find no error in the circuit court's determination on this point. However, we must also consider the second prong of the statute to determine whether the circuit court erred in finding that abandonment could not be established because Respondent Father did not know where the child resided. Phrased differently, the question for this Court is whether the statutory requirement that the birth parent "knows where the child resides" is subject to strict application, i.e., with no consideration of relevant circumstances. We easily conclude that it is not, as we first suggested twenty-five years ago in *In re Jeffries*. *See* 204 W. Va. at 360, 512 S.E.2d at 873.

*In re Jeffries* was another adoption case wherein, as with the case at bar, the primary question was whether a child's biological father had abandoned her. The father testified at the adoption hearing that he had made no effort to visit or communicate with the child because he "didn't know where she was" and had lost the biological mother's phone number. *Id*. at 363-64, 512 S.E.2d at 876-77. The father further admitted that he never tried to ascertain the child's whereabouts to arrange a visit or otherwise communicate with her. *Id*. at 364, 512 S.E.2d at 877. Notwithstanding this evidence, the circuit court concluded that the father had not abandoned the child because he did not know her place of residence and had made a "reasonable effort to try to determine both the location of this child and to make visitation with the child." *Id*.

We reversed, explaining first that "it is 'highly relevant for the circuit court to consider. . .whether the [biological parent]. . .was dilatory in grasping the opportunity to

10

assert his parental rights and responsibilities.'" *Id*. at 367, 512 S.E.2d at 880 (quoting *State*

*ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 638, 474 S.E.2d 554, 568 (1996)).  We went

on to recount the evidence showing that the father had, by his own admission, made no

effort to visit or communicate with the child before concluding that

> the trial court erred in its conclusion that the appellee tried but
> was unable to determine the location of the child and to make
> arrangements for visitation.  While the appellee may not have
> known where his child was specifically located at the time of
> her April 1996 birth, we see nothing in the record showing that
> the appellee himself ever tried to determine her whereabouts in
> the 18 months preceding the October 1997 hearing.

*Id*. at 368, 512 S.E.2d at 881; *see also In re Adoption of I.J.E.*, No. 17-1133, 2018 WL

5099648 (W. Va. Oct. 19, 2018) (memorandum decision) (concluding that the circuit court

did not err in finding abandonment where a biological father failed to attempt to learn the

children's whereabouts).  In short, we have long recognized that a birth parent who has the

ability to determine his or her child's whereabouts, but makes no attempt to do so, may not

use that lack of knowledge to thwart a finding of abandonment.

The requirement in section 48-22-306(a)(2) that a birth parent know where

the child resides is designed to protect a birth parent who has been intentionally deprived

of that information or is otherwise not reasonably able to ascertain the information of his

or her own accord.  The statutory language is not meant to enable a birth parent who has

remained willfully ignorant of the child's whereabouts to avoid a finding of abandonment

and stymie an otherwise appropriate adoption proceeding.  The language of West Virginia

Code section 48-22-306(a)(2) (2015) requiring a birth parent to "visit or otherwise

11

communicate with the child when he or she knows where the child resides" does not preclude a finding that a birth parent has abandoned a child when the evidence shows that the birth parent had the ability to ascertain knowledge of the child's whereabouts and chose not to do so.

It is undisputed that Respondent Father had Petitioner Stepfather's phone number for more than ten years, that said phone number was still in service, and that Respondent Father actually called that phone number ten days prior to the adoption hearing and spoke to Petitioners. There is no question that Respondent Father could have easily asked at any time in the preceding months where Petitioners were now living and whether he could arrange a visit with or communicate with R.L.; yet he did not do so. Moreover, we are convinced that Petitioner Father could have used this same means of communication in order to maintain a relationship with R.L. in the several years preceding the adoption proceeding, during which time he admitted he simply made no attempt to communicate with the child at all. In sum, the record clearly shows that despite clearly having the ability to communicate with R.L., Respondent Father simply opted not to do so for more than two-and-a-half years.

For that reason, we conclude the circuit court erred in failing to find that Respondent Father abandoned R.L. Accordingly, we reverse the circuit court's order

denying the petition for adoption and remand this matter for further proceedings consistent with this opinion.[12]

## IV.  CONCLUSION

For the foregoing reasons, we reverse the Circuit Court of Wayne County's September 17, 2021, Final Order, and remand this matter for further proceedings consistent with this opinion.

Reversed and remanded.

---

[12] The record indicates that R.L. is now more than twelve years old.  As such, on remand, we remind the circuit court of the statutory requirement that R.L.'s wishes be taken into account in determining whether the grant the petition for adoption.  *See* W. Va. Code § 48-22-301(f) (2015) ("If the child to be adopted is twelve years of age or over, the consent of the child is required to be given in the presence of a judge of a court of competent jurisdiction, unless for extraordinary cause, the requirement of such consent is waived by the court.").