Marlene SHEPPARD *v.* Robert SPEIR

CA 03-454                                                   157 S.W.3d 583

Court of Appeals of Arkansas
Division III
Opinion delivered April 7, 2004

*Appellant*, pro se.

*Jim Rose III*, for appellee.

OLLY NEAL, Judge. *Pro se* appellant Marlene Sheppard brings this appeal from an order of the Washington County Circuit Court that awarded appellee Robert Speir custody of the parties' child and changed the child's birth name. On appeal, Sheppard argues that appellee failed to prove a material change in circumstances and that changing the child's birth name was not in the child's best interest. We affirm.

The parties in this case were never married. Sheppard is the mother of four sons: K.D., age twelve; B.B., age six; J.S., age four; and Weather'By Dot Com Chanel Fourcast Sheppard, ten months. Each child has a different father. Sheppard's mother, Betty Miller, has guardianship of K.D. and B.B. Sheppard and her sons reside with Ms. Miller. This case only involves the custody and name change from Weather'By Dot Com Chanel Fourcast Sheppard (the child), born January 3, 2002. Following the child's birth, Sheppard initiated an action through the Office of Child Support Enforcement to establish paternity, and genetic testing was performed to determine the paternity of the child. The testing indicated that Speir was the child's father. Speir filed a petition seeking custody on May 16, 2002. The Office of Child Support

Enforcement filed a paternity complaint on May 17, 2002. Speir later filed a motion to consolidate the paternity and custody actions. The trial court granted the motion to consolidate and scheduled a hearing on the issues of paternity and visitation for July 23, 2002. A judgment of paternity, finding that Speir was the child's father, was entered on August 9, 2002. The paternity order stated that a hearing on the matter of custody would be held on October 31, 2002.

At the custody hearing, Speir testified that he had been married for one year and that, in addition to his child with Sheppard, he also had a two-year-old daughter. Speir's wife is not the mother of Speir's daughter. Speir said that his daughter visits every other weekend. Speir said that he has worked three-and-one-half years as the morning weather anchor for Arkansas, NBC Television. Speir previously worked in Illinois for Schwann's Ice Cream Delivery Sales and at a radio station in Effingham, Illinois. Speir testified that Sheppard had interfered with his visitation by not allowing him to have court-ordered weeknight visitation. Speir testified that since paternity was established, he had regularly paid child support and had made double child-support payments. At the time of the hearing, Speir had overpaid his child support by $483. During his testimony, Speir expressed a desire for the court to change the child's name to "Samuel Charles Speir."

Officer Thomas Wooten of the Springdale Police Department testified that he was dispatched to the home of Betty Miller on July 15, 2002. He said that the parties were in a dispute over the visitation schedule. He said that when he entered Ms. Miller's home, he found the home chaotic. He said that a child, B.B., was running around the home.

Monica Eisenhower, a Department of Human Services investigator, testified that she investigated an unfounded report of medical neglect filed against Speir. She said that it was alleged that Speir was not providing the child his asthma medication. Eisenhower testified that Sheppard was not sending the medication and that Speir had taken measures to provide the child with asthma medication. Eisenhower also testified that, as part of her investigation, she did a home visit with Sheppard. She described the home as chaotic and "sometimes dangerous to the younger children in the home." Eisenhower said that, while she was talking to Sheppard, B.B. was rather unruly and tried to bite Sheppard. She said at one point, while her back was turned, B.B. tried to throw a lamp shade at her.

Betty Miller testified that Sheppard and her four children reside with her. She said that her son and daughter-in-law also live with them and that up until his death, her brother had also lived with them. She said that they were purchasing the three-bedroom home in which they all lived. Miller said that K.D., B.B., and J.S. share a bedroom, her son and daughter-in-law have the master bedroom, Sheppard and the child share a room, and that she sleeps on the couch. Miller testified that she and Sheppard share in the responsibility of raising Sheppard's children. She said that K.D. is on medication to curb his anger and that B.B. had been diagnosed as "oppositional defiant." Miller said that B.B. wanted to jump out of a moving vehicle. She testified that during the past twelve years, the longest Sheppard had worked a job was six to seven months. During her testimony, Miller said that the child's name "[is] different. It's unusual. It's kind of stupid, but it's kind of cute."

Sheppard testified that she currently worked for Kentucky Fried Chicken earning six dollars an hour. She admitted that she does not hold a job very long and said that it was true that during the past five to seven years she has worked at the Elks Lodge, Allen Canning Company, Matthew Management, Waffle Hut, CiCi's, Pizza Inn, McDonald's, Hampton Inn, Day's Inn, Shoney's, Fazzoli's, Hardy's Galore, Denny's, and KPOM TV. She also admitted that she has been arrested eighteen times by the Fayetteville Police Department and eleven times by the Springdale Police Department. She testified that each arrest was for check forgery. Sheppard said that in 1994, she served twelve months in community punishment for forgery and theft of property. Sheppard admitted giving her mother guardianship of K.D. and B.B. She said that she had taken steps toward giving her mother guardianship of her younger two children.

During the hearing the following discussion was had between the court and Sheppard with regards to the child's name.

> THE COURT: I simply do not understand why you named this child — his legal name is Weather'by Dot Com Chanel Fourcast Sheppard. Now, before you answer that, Mr. — the plaintiff in this action is a weatherman for a local television station.

> SHEPPARD: Yes.

> THE COURT: Okay. Is that why you named this child the name that you gave the child?

SHEPPARD: It — it stems from a lot of things.

THE COURT: Okay. Tell me what they are.

SHEPPARD: Weather'by — I've always heard of Weatherby as a last name and never a first name, so I thought Weatherby would be — and I'm sure you could spell it b-e-e or b-e-a or b-y. Anyway, Weatherby.

THE COURT: Where did you get the "Dot Com"?

SHEPPARD: Well, when I worked at NBC, I worked on a Teleprompter computer.

THE COURT: All right.

SHEPPARD: All right, and so that's where the Dot Com [came from]. I just thought it was kind of cute, Dot Com, and then instead of — I really didn't have a whole lot of names because I had nothing to work with. I don't know family names. I don't know any names of the Speir family, and I really had nothing to work with, and I thought "Chanel"? No, that's stupid, and I thought "Shanel," I've heard of a black little girl named Shanel.

THE COURT: Well, where did you get "Fourcast"?

SHEPPARD: Fourcast? Instead of F-o-r-e, like your future fore-cast or your weather forecast, F-o-u, as in my fourth son, my fourth child, Fourcast. It was —

THE COURT: So his name is Fourcast, F-o-u-r-c-a-s-t?

SHEPPARD: Yes.

. . .

THE COURT: All right. Now, do you have some objection to him being renamed Samuel Charles?

SHEPPARD: Yes.

THE COURT: Why? You think it's better for his name to be Weather'by Dot Com Chanel —

SHEPPARD: Well, the —

THE COURT: Just a minute for the record.

SHEPPARD: Sorry.

THE COURT: Chanel Fourcast, spelled F-o-u-r-c-a-s-t? And in response to that question, I want you to think about what he's going to be — what his life is going to be like when he enters the first grade and has to fill out all [the] paperwork where you fill out — this little kid fills out his last name and his first name and his middle name, okay? So I just want — if your answer to that is yes, you think his name is better today than it would be with Samuel Charles, as his father would like to name him and why. Go ahead.

SHEPPARD: Yes, I think it's better this way.

THE COURT: The way he is now?

SHEPPARD: Yes. He doesn't have to use "Dot Com." I mean, as a grown man, he can use whatever he wants.

THE COURT: As a grown man, what is his middle name? Dot Com Chanel Fourcast?

SHEPPARD: He can use Chanel, he can use the letter "C."

THE COURT: And when he gives his Birth Certificate — is it on his birth Certificate as you've stated to the Court? Does his Birth — does this child's Birth Certificate read "Weather'by Dot com" —

SHEPPARD: That's how I filled out the paperwork for his —

THE COURT: — Chanel Fourcast?

SHEPPARD: Yes, and for his Social Security card, I filled it out as Weather'by F. Sheppard.

THE COURT: All right.

Following the custody hearing, the trial court entered an order on November 21, 2002, finding that it was in the child's best interest to award Speir custody. The trial court also found that it

would be in the child's best interest for the child's name to be changed to Samuel Charles Speir. After Sheppard filed a motion for new trial and a motion to vacate judgment, the trial court entered a subsequent order on March 31, 2003, stating that a material change of circumstances had occurred since the time of the child's birth and that it was in the best interest of the child that custody be awarded to Speir. The trial court further stated that evidence supporting its conclusions were detailed in its March 4, 2003 bench order that was being incorporated by reference. From those orders come this appeal.

In her first argument on appeal, Sheppard alleges that the trial court erred when it awarded Speir custody of their child, because Speir failed to prove a material change in circumstances. In reviewing child-custody cases, we consider the evidence *de novo*, but will not reverse the trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Middleton v. Middleton*, 83 Ark. App. 7, 113 S.W.3d 625 (2003). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Durham v. Durham*, 82 Ark. App. 562, 120 S.W.3d 129 (2003). We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2003). In custody cases, the primary consideration is the welfare and best interest of the child involved, while other considerations are merely secondary. *Durham v. Durham, supra.*

Arkansas Code Annotated section 9-10-113(a) (Supp. 2003) provides that an illegitimate child shall be in the custody of its mother unless a court of competent jurisdiction enters an order placing the child in the custody of another party. *Freshour v. West*, 334 Ark. 100, 971 S.W.2d 263 (1998). Section 9-10-113(b) provides that a biological father may petition the court for custody if he has established paternity in a court of competent jurisdiction. *See id.* Custody may be awarded to a biological father upon a showing that: (1) he is a fit parent to raise the child; (2) he has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and (3)

it is in the best interest of the child to award custody to the biological father. Ark. Code Ann. § 9-10-113(c) (Supp. 2003).

■ In *Norwood v. Robinson*, 315 Ark. 255, 866 S.W.2d 398 (1993), our supreme court held that in addition to the three factors enumerated in section 9-10-113(c), the father of an illegitimate child must show a material change of circumstances. The court found that "[i]mplicit in the order of paternity establishing visitation was a determination that custody should continue to rest in the mother." *Id.* at 259, 866 S.W.2d at 401.

■ The present case is distinguishable from *Norwood v. Robinson, supra.* The paternity order in *Norwood* granted the appellant reasonable visitation and set the amount of child support. Two years following the entry of the paternity order, the appellant in *Norwood* sought to change custody. In the case at bar, Speir filed his petition for custody prior to the entry of the August 9 paternity order. Speir's petition for custody and the paternity complaint were subsequently consolidated. The resulting paternity order only set temporary visitation and went on to state that the issue of custody would be determined on October 31, 2002. Therefore, because the issue of custody was not resolved in the paternity order, Speir was not required to show a material change in circumstances.

In its March 4 bench order the trial court stated:

> There's no question that a paternity Order was established and that the biological father of the child was found to be Randy Speir [sic]. The Statute goes on to say, 'The court may award custody to the biological father upon a showing that, (1) he is a fit parent to raise the child.' Mr. Speir is found by the court to retain the same employment in excess of three years, and maintain continuous employment for at least five years.
>
> He has resided in Northwest Arkansas for the past three and a half years.
>
> That he's married to a Martha Speir, and that he resided with his wife and had been married for approximately a year an a half, and that Mr. Speir had one daughter, and that he his wife, Martha, had a very amicable working relationship with the mother of Mr. Speir's daughter, and that he supported that child and enjoyed visitations with that child. This court finds that there was nothing in the

evidence anywhere to support any sort of finding other than that Mr. Speir was a fit parent to raise the child. Now, Number (2), in the Statute states, 'That he has assumed his responsibilities toward the child by providing care, supervision, protection and financial support for the child.' Well, the record shows that he began paying — as soon as paternity was established, he began paying child support. In fact, the evidence before this court suggest that he had paid in excess of $400 more than he owed in child support, and that during the course of visitation, he cared for the child.

The record will reflect an extended visitation in order to get to know the child, and that during the course of that visitation, there were some allegations made by Ms. Sheppard that were unfounded regarding his ability to care for the child and supervise and protect the child.

Certainly, he has provided financial support for the child, and I believe that the record will show that at one point the child had some problems with asthma and needed to have some albuterol medication. There was a time during the visitation this court finds that Mrs. Sheppard refused to give Mr. Speir the child's medication for his asthma. Mr. Speir then, on his own, secured the medication for the child, and I think that he assumed his responsibilities when this child was a very, very, tender age and that the requirements in subsection (c)(2) have been met. Now, Number (3) states, 'It is in the best interests to award custody to the biological father.' The court found that it was in the best interests of the child to award custody to the biological father[.] . . .

The court then went on to discuss its concerns about Sheppard. The court found that, due to Sheppard's inability to maintain employment, she had no means of taking care of the child. The court stated that Sheppard's interference in Speir's visitation suggested that Sheppard would not aid in the facilitation of a meaningful relationship between Speir and the child. The court further found that the grandmother's home was not a safe place to raise a child. The court also expressed concern that the mental-health issues of Sheppard's two older sons posed a danger to the other children.

Based upon its detailed bench order, it is clear that the trial court gave careful consideration to what was in the child's best interest. Therefore, we cannot say that the trial court's decision to award custody to Speir was clearly erroneous.

Sheppard also argues that the trial court's decision to change the child's birth name was not in the child's best interest. Although there is no Arkansas case law that addresses the changing of a child's entire name, we are guided by our case law as it pertains to the changing of a child's surname. The best interest of the child is the dispositive consideration in determining whether a child's surname should be changed. *Carter v. Reddell*, 75 Ark. App. 8, 52 S.W.3d 506 (2001). Pursuant to *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999) (*Huffman I*), in determining the child's best interest, the trial court should consider the following factors: (1) the child's preference; (2) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (3) the length of time the child has borne a given name; (4) the degree of community respect associated with the present and proposed surnames; (5) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; (6) the existence of any parental misconduct or neglect. *Id.* at 68, 987 S.W.2d at 274. Where a full inquiry is made by the trial court regarding the implication of these factors and a determination is made with due regard to the best interest of the child, the trial court's decision will be upheld where it is not clearly erroneous. *Carter v. Reddell, supra.* A finding is clearly erroneous when, although there is evidence to support it, upon reviewing the entire evidence, the court is left with a definite and firm conviction that a mistake has been committed. *Id.*

Sheppard argues that the decision to change the child's name was not in the child's best interest because the trial court "focused almost exclusively" on the factor of potential embarrassment to the child. The trial court can only weigh the factors for which the parties provided evidence or that were relevant under the circumstances. *Matthews v. Smith*, 80 Ark. App. 396, 97 S.W.3d 418 (2003).

The March 4 bench order indicates that the trial court gave due consideration to each of the six enumerated factors. In the order, the trial court stated the following:

> Now, the court should consider six factors in changing the name of the children, and the first factor is the child's preference. Well, at the time this court entered its order, the child has [sic] just one year old last month, and in October wasn't even a year old, and so I don't

think that number one is applicable to this child. Number two is the effect of the change of the child's name on the preservation and development of the child's relationship with each parent.

Well, Ms. Sheppard, also known as Braun, stated to the court that she changed K.D.'s surname . . . and so we have one child that has a different name in the household.

She also stated that[,] although she had this second child by a man named Hartsfeld, she was at that time married to a man named Braun, and I believe her testimony was that she stayed one night with him and the next day he went back to Florida, but nonetheless, she went by the name of Braun and so she named B.B., . . . . So now out of four children, there are two with different surnames. She also stated that[,] after she divorced Mr. Braun, she married another gentleman, and that gentleman's name was Robert Lee Skaggs, but that Robert Lee Skaggs was really Merle Eric Hudson III, and she stated, when asked if she was still married, she said, 'I physically didn't take Robert Lee Skaggs into matrimony. I physically wasn't holding his hand, and he didn't put a ring on my finger. Merle Eric Hudson III did.' When asked further, she stated that she didn't know if she was still married or not. I can't tell you what Ms. Sheppard's last name is, but I can tell you that the father of the child, Mr. Randy Speir [sic], has always been known as Mr. Randy Speir [sic].

The stepmother of the child's surname is Speir, and the name of the half sister on this [sic] child's father's paternal side is Speir, and so in light of the numerous names of the children in the household, as well as Ms. Sheppard's confusion, I think to preserve the child's name as Speir for the development of the relationship of this child with both parents, is in his best interests.

The third factor is the length of time the child has borne a given name, and of course, in this child's life, it's been very, very short and minimal. Number four is the degree of community respect associated with the present and proposed surnames. Well, Ms. Sheppard has testified that she has lived with her mother, Ms. Betty Miller, in Washington County for at least the last twelve years, and in that twelve .year period of time, she's had four children by four different fathers, all illegitimate, and she's been married to at least two people, and perhaps three.

The level of community respect associated with the proposed surname of Mr. Speir, I think the evidence is clear that there's

nothing to indicate to the court that there's any sort of disrespect or problems associated with his surname, and Ms. Sheppard, by her own volition, in this community has been arrested so many times that I think it's in the best interests of the child to change his name to Speir.

Of course, the difficulties, harassment, and embarrassment of the child makes sense from bearing the present proposed name (Weather'by Dot com Chanel Fourcast Sheppard). I asked Ms. Sheppard about his name, and she stated to the court, 'He doesn't have to go to [sic] use dot com. I mean as a grown man, he can use whatever he wants. He can use Chanel,' which she stated was after the perfume, or he could use the letter C. She stated that she filled out his social security card as Weather'by F. Sheppard, so I think by her own admission by stating that she perceives problems with the child regarding his embarrassment — and this also goes to the existence of her parental misconduct regarding giving him that name — I think she anticipated that the child might suffer from embarrassment, and that's why she suggested to the court that she had already used the name F. Sheppard on his social security card and that he doesn't have to use dot com when he's in the first grade trying to fill out his papers as to what his name is.

Based on these facts, we hold that the trial court did not err in determining that it was in the child's best interest to change his name.

Affirmed.

VAUGHT and ROAF, JJ., agree.