2009 Ark. App. 594

**Clayron RASBERRY, Appellant,**

v.

**Anessa RASBERRY, Appellee.**

No. CA 09–49.

Court of Appeals of Arkansas.

Sept. 16, 2009.

Robinson, Zakrzewski & Achorn, PA, by Luke Zakrzewski, Pine Bluff, AR, for appellant.

Sharon M. (Fortenberry) Nichols, Pine Bluff, AR, for appellee.

DAVID M. GLOVER, Judge.

Appellant, Clayron Rasberry, argues that the trial court erred (1) in placing custody of the parties' minor son with appellee, Anessa Rasberry, and (2) in disposing of certain real property. We affirm.

A temporary hearing was held on the issue of custody of the parties' minor child. Finding neither party unfit and specifically qualifying the ruling to be subject to change at the final hearing, the trial court granted temporary custody to Clayron. The temporary custody award to Clayron turned on a May 7, 2007 incident involving Anessa's employment at UAMS. That day she was told by her supervisor that she was not going to be able to continue her employment in the science laboratory where she worked. Though the supervisor denied using the word "terminated" and testified that she was satisfied with Anessa's work and wanted to help her find another position, it was Anessa's position that her supervisor had told her she was terminated. Immediately following the May 7 conversation, Anessa left the build-

ing and went to her car, where her supervisor later found her sitting in the driver's seat rocking back and forth, nonresponsive to verbal communication. Her supervisor thought that Anessa was having some type of anxiety attack and called for paramedics and the police. It was reported that Anessa had then stated that she was going to kill herself and her children; however, none of the witnesses at the temporary hearing testified to hearing Anessa make those statements. As a precaution, Anessa was taken to the hospital, and was determined to be okay.

Anessa admitted that the May 7 incident had happened, and that it was an anxiety attack. She stated that she received no follow-up treatment after the incident because she was advised that she was "fine." Anessa blamed the anxiety attack on a combination of the stress from Clayron, which included bringing his fifteen-year-old son from a previous marriage into the home without consulting her and expecting her to care for him in addition to her son from a previous relationship and the parties' child, as well as the news that her supervisor was terminating her.

The trial court awarded temporary custody to Clayron. While noting that it was understandable that Anessa was upset over being informed that she was being terminated, the trial court stated that it could not understand why Anessa's conduct rose to a level where first responders and police officers were called out. The trial court reasoned that while Anessa had admitted to Clayron that she did not handle stress well, everyone has to deal with stress at one point or another, and that you have to keep going and do the best you can do. Noting that it had not heard that Clayron had trouble dealing with stress, under the circumstances, the trial court awarded temporary custody to Clayron.

At the final hearing, the only issues before the trial court were permanent custody of the parties' minor son and division of the residence in which the parties lived during the marriage. Prior to the final hearing, the trial court ordered both parties to undergo psychological evaluations. These were sent to the trial court and made part of the record as the court's exhibit. At the close of all the testimony, the trial court took the case under advisement.

The trial court issued a letter opinion on September 10, 2008, citing the court-ordered psychological and custody evaluations of both parties, the trial court's notes, and the file, finding that the evidence preponderated in favor of awarding full custody of the parties' child to Anessa. In a second letter dated September 12, 2008, the trial court added these remarks: both parents were fit and proper parents, the trial court's opinion was based upon the best interest of the parties' minor child, and no specific findings of fact or conclusions of law were noted in the letters because the hearing was closed.

Clayron requested that the trial court make specific findings of fact and conclusions of law, and on September 19, 2008, the trial court held a closed hearing for that purpose. In that hearing, the trial court stated that the parties were both fit and proper parents, appeared to be moral persons of character, were generally stable, and had extended family members who could assist them. It also noted that while Anessa was terminated from her employment at UAMS, it was only for a temporary period of time, and that she was currently still employed at UAMS in her original position. It noted that Clayron's employment with the railroad required him to be away from home from time to time, while Anessa's employment did not require her to travel. The trial court not-

ed that it was not bound by the court-ordered evaluations of the parties and that it determined the weight to be accorded to the evaluations. The trial court then recited the summary of the findings of the evaluations:

> We find that both Clayron and Anessa Rasberry show capacity to be good parents. We also find that both have significant issues in terms of anxiety, stress, and anger management. However, Mr. Rasberry's problems in these areas seem greater than those of Anessa Rasberry. Therefore, it is our recommendation that custody of [the minor child] go to his mother with [his] father having liberal visitation privileges. It is also our recommendation that both parents seek therapy for issues concerning anxiety and anger management.

The trial court noted that each party's evaluation discussed the incident concerning Anessa's being fired from her job at UAMS, problems in the marriage, each party's background and medical history, and why each party thought they were a better custodial parent, and concluded with the examiners' impressions. The trial court found that, when the evaluations were given the appropriate weight, the evidence preponderated in Anessa's favor.

### Custody

Clayron argues that the trial court erred in awarding custody of the parties' minor child to Anessa instead of him. Specifically, he argues that the apparent anxiety attack Anessa experienced, coupled with the fact that she failed to seek counseling for the incident, "militates the conclusion that the circuit court's decision does not serve [the child's] best interests." We disagree.

In *Sheppard v. Speir*, 85 Ark.App. 481, 489, 157 S.W.3d 583, 588 (2004) (citations omitted), this court recited its well-settled standard of review for child custody:

> In reviewing child-custody cases, we consider the evidence *de novo*, but will not reverse the trial court's findings unless they are clearly against the preponderance of the evidence. A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. In custody cases, the primary consideration is the welfare and best interest of the child involved, while other considerations are merely secondary.

In his brief, Clayron states that while he does not necessarily dispute the trial court's determination that, in this particular case, the question of the child's best interests hinges upon which parent experiences greater problems with anxiety, stress, and anger management, he does dispute the conclusion that his problems with anxiety, stress, and anger management are greater than those of Anessa and that the award of custody to Anessa serves the child's best interests. This argument seems to be based upon the fact that Anessa experienced an anxiety attack on May 7, 2007, and did not seek further treatment or counseling for the incident, while he has not experienced such an attack. The May 7 incident was thoroughly addressed throughout these proceedings and in both parties' psychological evaluations, as well as in this opinion. There is no evidence that the May 7 incident was anything oth-

er than an isolated event experienced by Anessa. The psychological examiners, with full awareness of the incident, recommended that custody of the parties' child be placed with Anessa. The trial court, being in the best position to evaluate the parties, viewed each party's demeanor, heard all of the evidence in this case, and set forth a detailed and thoughtful analysis for its decision to grant custody to Anessa. We cannot say that the trial court's decision was clearly against the preponderance of the evidence.

### Residence During Marriage

Clayron also argues that the trial court erred in its disposition of the parties' real property. While the parties agreed on the disposition of all other property, they asked the trial court to dispose of the residence in which they lived during the marriage. While specifically conceding that the residence was Anessa's separate, nonmarital property, Clayron contends that the trial court erred in not considering "his contribution to the marital residence in its disposition of the property." Clayron points to testimony from Brian Castle, a real-estate mortgage-loan officer at the Pine Bluff Cotton Belt Federal Credit Union, that the property was sold at a discount by Clayron's sister-in-law as an early wedding gift. His testimony was that the loan, although in Anessa's name, would not have been made without Clayron, as he was the credit-union member, and his salary was also considered when making the loan. He stated that the loan was made with the understanding that the parties would be married. Clayron offers these reasons why the trial court should have awarded him some of the equity in the residence as compensation for his contributions to the residence.

With respect to the division of property in a divorce case, the appellate courts review a trial court's findings of fact and affirm them unless they are clearly erroneous. *Powell v. Powell*, 82 Ark.App. 17, 110 S.W.3d 290 (2003). In *Powell*, the husband owned a farm prior to marriage that was subject to a mortgage of $141,508 at the time of marriage, and that debt was reduced to $5,800 at the time of the divorce. The trial court awarded the wife one-third of the reduction of the indebtedness; on appeal, she argued that the trial court erred in not awarding her one-half of the reduction in indebtedness. The appellate court affirmed the trial court, holding that

> [i]t is true that there is a presumption that an increase in the value of nonmarital property resulting from the time, efforts, and skill of a spouse is regarded as a marital asset. However, a mere reduction in a single item of indebtedness is not the same thing as an increase in the overall value of the property, which would require evidence of the fair-market value of the farm both before and after the marriage. There is evidence in the present case regarding the value of the farm at the time of the divorce, but we find nothing in the record that would allow the trial judge to determine the premarital value of the farm. Without evidence of the before-and-after value of the property to show the existence and extent of any increase in the value of the nonmarital property, any reduction in debt on nonmarital property is not considered to be marital property to be divided equally; instead, the non-owning spouse is simply entitled to have the martial contribution considered in balancing the equities involved in the property division.

82 Ark.App. at 19–20, 110 S.W.3d at 292 (citations omitted).

In this case, Clayron placed into evidence a letter from his sister-in-law,

Toni Middleton Rasberry, stating that the last appraised value, to her knowledge, was approximately $99,000, and that the property was being sold to Anessa Haney for the discounted price of $88,000 as an early wedding gift. This letter was written in January 2005, approximately two months before the parties' marriage in March 2005. This was the only evidence of the value of the residence prior to the marriage. No evidence was presented as to the value of the residence at the time of the parties' divorce, nor was there any evidence of the amount of reduction of indebtedness. However, Anessa testified that she paid 99.9% of the bills. Clayron argues in his reply brief that because the parties settled all other property and debt-related issues between themselves, the trial court never had the opportunity to consider his marital contribution to the residence, and he submits that this court should remand the case to the circuit court to take evidence as to the value of the property during the relevant time periods. We disagree. Clayron had an opportunity to submit evidence to the trial court regarding his contributions to the nonmarital real property that served as the parties' residence during the marriage, and he failed to do so. Given that failure of proof, we cannot say that the trial court erred in awarding Clayron no financial benefit from the residence.

Affirmed.

GLADWIN and HENRY, JJ., agree.