No. 11-1694 - In re: Name Change of Jenna A.J.

Workman, Justice, Dissenting:

I dissent both from the Court's judgment in this case and from most of the majority's reasoning. The decision of the circuit court was well within its discretion and I see no principled basis on which to overturn it; this Court has, in effect, re-weighed the evidence, utilizing certain hard-and-fast rules, tests and presumptions we have previously mandated in our seminal name change cases, *In re Harris*, 160 W. Va. 422, 236 S.E.2d 426 (1977), and *Lufft v. Lufft*, 188 W. Va. 339, 424 S.E.2d 266 (1992).[1] In my view, with respect to those cases, this Court's opinion in *Harris* has long since outlived its judge-made sociological underpinnings, and our opinion in *Lufft* is a textbook example of the adage that hard cases make bad law. In short, our precedents are outmoded and completely unmoored from what should be the focus in these cases: the best interests of the child, taking into account the

---

[1]Although not the basis for this dissenting opinion, I take issue with the majority's conclusion that for purposes of this Court's analysis in a name change case, a petition seeking to hyphenate a child's surname is no different from a petition to change the child's surname entirely. In the former circumstance, presented in both *Harris* and *Lufft*, one parent is confronted with the elimination of his or her surname altogether; in the latter, the parent's surname is sought to be joined with that of the other parent. *E.g.*, *Andrews v. Andrews*, 454 N.W.2d 488, 491 (Neb. 1990) ("Consequently, the proposed and requested change in the children's surname . . . reflects both maternal and paternal surnames."). I believe that where hyphenation, rather than elimination, of a name is sought, this is one of many factors to be considered in deciding whether a name change petition should be granted. See text *infra*.

1

realities of the child's living circumstances. Finally, in this latter regard, I urge this Court to join the growing number of jurisdictions that have abandoned hard-and-fast rules and tests in favor of an approach wherein a broad number of factors are examined and weighed in determining whether a name change is in the best interests of a child.

I begin with this Court's precedents. In *Harris*, Cynthia Louise Harris, who was divorced from James Edward Harris, Jr., sought to change her surname and that of her minor child to Struble, Ms. Harris' maiden name. The circuit court denied relief, and Ms. Harris appealed. This Court prefaced its discussion by noting that it had granted the appeals "in order to settle the law in this State on the right of a divorced woman with minor children to change her name and the right of the guardian of a minor child to have the child's name changed." 160 W. Va. at 423, 236 S.E.2d at 427. With respect to the first issue, the Court arrived at what today seems the unremarkable conclusion that because West Virginia Code § 48-5-1 (1969) gives *any* person the right to change his or her name, the statute cannot be read to exclude a divorced woman with children from its ambit.[2] With respect to the second issue, the Court wrote that

> [a] father's interest in having his children bear his name is a
> valuable and protectable interest, although it is not a property

---

[2]The circuit court had denied Ms. Harris' request for restoration of her maiden name because West Virginia Code § 48-2-23 (1969), in existence at that time, provided that in an annulment or divorce proceeding, a woman's maiden name could only be restored if she had no living children.

right nor such an interest as cannot be taken away from the parent, if the best interest of the child will be served. The law imposes upon a male parent an obligation to support his children while both morality and social convention demand that a father concern himself with the welfare of his children even if he is divorced from the children's mother and does not have custody of the children. Long-standing social convention has made the surname of a child the same as that of the father.

160 W. Va at 426, 236 S.E.2d at 429 (internal citations omitted).

The Court then went on to enumerate the financial and reputational assets that a child might enjoy by virtue of sharing his or her father's surname, not to mention "a substantial edge in life when [the child] seek[s] credit, employment, or admission to tightly controlled union, trade or professional groups[,]" concluding that "[o]f course, all of these benefits could *theoretically* pass through the female line as well as the male line, but it is not customary." *Id.* at 427, 236 S.E.2d at 429 (emphasis added).

The Court then held, based on the existence of a father's "protectable interest in his children bearing his surname [which is] one *quid pro quo* of his reciprocal obligation of support and maintenance[,]" *id.*, that

where a father is supporting his child, takes an interest in the child's welfare, and is *in any way* performing the parental responsibility which both the law and social norms impose upon him, or where a father who has exercised his parental rights and discharged his parental responsibilities is dead, the name of the child may not be changed absent a showing by clear, cogent, and

3

> convincing evidence that such change will significantly advance
> the best interests of the child.[3]

*Id*. at 427-28, 236 S.E.2d at 429 (emphasis and footnote added).

Thirty-six years later, the best that can be said about the Court's exegesis on historical patronymic custom and the rights of male parents is that it is outdated. In fact, the Court's analysis in *Harris* is downright anachronistic; "[t]o the extent the father's objection [to a name change] was based on traditional values, meaning that it is Anglo-American custom to give a child the father's name, the objection is not reasonable, because neither parent has a superior right to determine the surname of [a] child." *In the Matter of Eberhardt*, 83 A.D.3d 116, 123, 920 N.Y.S.2d 216, 221 (2011). Further, most of the Court's sociological assumptions in *Harris*, such as its lengthy description of possible benefits flowing to children by virtue of carrying their fathers' surnames, although not their mothers', appear to have been created from whole cloth.

Any law based on an analysis which the Court itself categorizes as "descriptive, not normative," is law based on a shaky foundation and deserving of little if any weight as

---

[3]The only example given by the Court of a circumstance in which a name change *might* be granted was where the father was "a notorious criminal" whose surname would create "such a stigma or embarrassment that the child's mental health would be jeopardized or his or her opportunities in life narrowly circumscribed." 160 W. Va. at 428, 236 S.E.2d at 429-30.

4

precedent. Times have changed. In 2013, a significant percentage of children in this country reside in single-parent households; a significant number are born to parents who have never been married; and society recognizes that mothers, as well as fathers, have surnames that convey benefits, both financial and otherwise, to their children. Further, in 2013, the idea that only a father has a "protectable interest in his children bearing his surname" – even if he's dead – is jarring.[4]

I believe that *Harris* should be overruled or, failing that, quietly interred on the basis that "facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification[.]" *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 855 (1992) (citation omitted). Where, as in this case, the mother and father have never been married, the mother has always had custody of the child, the father's decision to finally bring his child support up to date occurred just in time for hearing on the mother's request for a name change, and the mother wants nothing more than to hyphenate the child's name, not erase the father's name completely, any application of the anachronistic

---

[4]As cogently stated by the Supreme Court of California in *In re Schiffman*, 620 P.2d 579, 583 (Cal. 1980) (en banc),

> the changing family patterns that are recognized and encouraged by the Uniform Parentage Act support the conclusion that once-accepted assumptions about 'family identity' and 'noncustodial fathers' are losing force. To the extent that understandable concerns do arise in particular cases cannot they be fully considered in the context of the 'child's best interest' test?

5

decision in *Harris* is unfounded and unjust. Here, as in *Eberhardt*, the father's "objection must relate to the child's best interests or bear on the parent's relationship with the child, and the father failed to articulate, nor could he, how the patronymic custom was relevant to either of those concerns." 83 A.D.3d at 123, 920 N.Y.S.2d at 221.

In *Lufft*, this Court was presented with a case that can be described as the flip side of *Harris*: the parties' child had carried her mother's name from birth, and the father sought to have her surname changed to his own, asserting, *inter alia*, that the child's use of her mother's name meant that "she would be tarred forever with the stigma of illegitimacy." *Lufft*, 188 W. Va. at 340, 424 S.E.2d at 267. A family law master granted the father's request, the circuit court adopted the law master's recommendations, and the mother appealed. This Court reversed, acknowledging (in a masterpiece of understatement) that "the *Harris* case was weighted toward the child retaining the father's surname," *id*. at 342, 424 S.E.2d at 269, but concluding that "it is equally applicable to any name change, including one changing a child's last name from the mother's maiden name to the father's surname." *Id*.

This Court noted that the father had never made a request for a name change until divorce proceedings were filed,[5] making "this . . . look suspiciously like an attempt to anger

---

[5]The parents were married a year and a half after their child was born, and the marriage lasted less than six months.

the [mother]." *Id*. After quickly dismissing the father's illegitimacy argument, the Court held that "any name change involving a minor child [may] be made only upon clear, cogent, and convincing evidence that the change would significantly advance the best interests of the child." *Id*. Finding that the father had presented no such evidence, the Court reversed the circuit court, finding "no reason to change the child's name." *Id*. Significantly, the Court also remanded the case with directions that the family law master examine whether the father's visitation of his child should be supervised, in light of the father's history of physical violence not only to the mother (whom he had battered in front of the child) but also to his current girlfriend.

A careful examination of *Lufft* leads inexorably to the conclusion that hard cases make bad law. The facts in *Lufft* were about as "hard" as facts can be: the father was a violent, abusive individual who had no interest whatsoever in his child bearing his name until divorce proceedings arose, whose motive was clearly one of retaliation, and whose only argument was an illusory "stigma of illegitimacy."[6] In response to these facts, this Court established an extraordinary high standard of proof for all name change cases involving children, a

---

[6]The facts in *Lufft* are similar to those in *Wilson v. McDonald*, 713 S.E.2d 306 (S.C. Ct. App. 2011), where an unmarried, uninvolved father sought to force a name change after being served with a suit seeking child support. Noting that South Carolina law requires the parent seeking a name change to "prov[e] the change furthers the child's best interests[,]" the *Wilson* court identified nine non-exclusive factors to be considered, *id*. at 308, and not surprisingly concluded that the father had failed to meet most of them.

standard that has heretofore been utilized only in cases involving constitutional rights and/or personal or property rights so firmly established in the law as to be presumptive. *E.g.*, Syl. Pt. 3, *Burnside v. Burnside*, 194 W. Va. 263, 460 S.E.2d 264 (1995) (clear, cogent and convincing evidence required to defeat presumption of gift to the marital estate, where the separate property of one spouse used to pay joint obligation); Syl. Pt. 3, *Belcher v. Terry*, 187 W. Va. 638, 420 S.E.2d 909 (1992) (clear, cogent and convincing evidence of employer's knowledge of obligor's intention to evade child support required to hold employer liable for failure to withhold support); *State v. McWilliams*, 177 W. Va. 369, 379, 352 S.E.2d 120, 130 (1986) (clear and convincing evidence required to support involuntary civil commitment); Syl. Pt. 2, *Wheeling Dollar Sav. & Trust Co. v. Singer*, 162 W. Va. 502, 250 S.E.2d 369 (1978) (clear, cogent and convincing evidence of equitable adoption required to defeat legatee's entitlement); Syl. Pt. 6, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973) (clear, cogent and convincing evidence required to support termination of parental rights); Syl. Pt. 2, *Beckley Nat. Exch. Bank v. Lilly*, 116 W Va. 608, 182 S.E.2d 767 (1935) (clear and convincing evidence required to defeat one's property rights by another's establishment of easement by prescription).

That the evidentiary bar set in *Harris* and *Lufft* is unreasonably high became starkly apparent in this Court's next name change case, *In re Carter*, 220 W. Va. 33, 640 S.E.2d 96 (2006), where respondent mother petitioned on behalf of her fifteen-year-old son to change

the boy's surname to that of his stepfather. The son testified that he desired the name change, that his stepfather "was the only father he had ever known and that he did not have any memories of his biological father[,]" and that he wanted to have the same surname as his mother, sister and stepfather. 220 W. Va. at 34, 640 S.E.2d at 97. The circuit court ruled in favor of the mother and son, finding that although the biological father had paid court-ordered child support, the following facts were more than sufficient to support the requested name change:

> Mr. Carter had not visited or contacted his son for more than thirteen-and-one-half years; had not maintained health insurance coverage for his son as ordered by the court; had not shared equally the costs of health care not covered by insurance as ordered by the court; had not telephoned his son or sent his son Christmas presents or cards; had never sent his son a birthday card or present; and made no attempt whatsoever to communicate with his son.

*Id*. at 35, 640 S.E.2d at 98.

Notwithstanding these facts,[7] which may not establish abandonment but come perilously close,[8] this Court reversed the circuit court's judgment, concluding that because

---

[7]As aptly summarized by the dissenting justice, the father had "done nothing for [his son] other than that which he had to do to avoid criminal sanction: he paid court-ordered child support in a minimal amount." 220 W. Va.at 38, 640 S.E.2d at 101 (Benjamin, J., dissenting).

[8]West Virginia Code § 48-22-306(a) (2009) provides in relevant part that

> [a]bandonment of a child over the age of six months shall be

(continued...)

9

the biological father "ha[d] not abandoned *all* duties of a father[,]" the essence of the test in *Harris*, the circuit court had abused its discretion in granting the request for a name change. *Id.* at 37, 640 S.E.2d at 100 (emphasis supplied). In light of the circuit court's findings of fact, which were not disputed, one can only ask: if this wasn't clear and convincing evidence under *Harris* and *Lufft*, what could be? Evidence that the parent seeking a name change is a "notorious criminal," *Harris*, 160 W. Va. at 428, 236 S.E.2d at 429, the only exception to the hard-and-fast rule suggested in that case?

Finally, in *In Re Ashworth*, No. 101218 (W. Va. filed February 11, 2011) (memorandum decision), this Court summarily rejected the appeal of a putative father – one who exercised visitation with his child, paid child support, and did not have any of the unsavory "baggage" associated with Mr. Lufft – who argued that his child's surname should

---

[8](...continued)
presumed when the birth parent:

(1) Fails to financially support the child within the means of the birth parent; and

(2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child[.]

*See In re: William Albert B.*, 216 W. Va. 425, 429, 607 S.E.2d 531, 535 (2004); *In re Carey L.B.*, 227 W. Va. 267, 274, 708 S.E.2d 461, 468 (2009).

be changed to his own. We held that "[w]hether the name change would significantly advance this child's best interests was within the discretion of the family court," *Ashworth*, No. 101218, slip op. at 2, distinguished *Harris* on the ground that Mr. Harris did not seek a name change but rather sought to have his child *retain* his name, *id*., slip op. at 1, and ignored *Carter* altogether. Although I believe that *Ashworth* was correctly decided, inasmuch as there was nothing in the record on which to base a finding that the circuit court abused its discretion, it would have been wise for this Court to use the case as a vehicle to address our precedents – which we mentioned only in passing – and establish a more flexible approach to be utilized in name change cases.

In my view, *Ashworth*, not *Harris*, *Lufft* or *Carter*, should be the basis for a new approach for this Court on review of name change cases. Our focus should be on whether the lower court's decision was within its broad grant of discretion, not on our notions of societal norms and quid pro quo entitlements (payment of child support = naming rights), the underpinning in both *Harris* and *Carter*, and not on our *sub silentio* evaluation of the parents' respective character flaws, as in *Lufft*. These should be factors for the trier of fact to consider as part of the totality of the evidence, but they should not be determinative in and of themselves. Further, we should not be adhering to a standard of proof appropriate to cases involving constitutional rights and long-established personal and property rights; neither parent in a name change case should be entitled to a presumption that the best interests of the

11

child are served by maintaining the status quo. All of the barriers that this Court has erected to prevent changing or hyphenating a child's name take us far away from what should be the lodestar consideration in these cases: whether a name change promotes the best interests of the child in the circumstances of his or her life, a decision uniquely suited to be resolved by the trier of fact.

In the case at bar, the majority gives far too little deference to the circuit court's finding of some key facts: that the petitioner and the respondent have never been married; that the child has always lived with her mother; and that the child was only two years old at the time the name change was sought. Further, the majority has given far too little deference to the circuit court's first-hand observation of the parties' demeanor and testimony.[9] Finally, the majority has indulged in some appellate fact-finding, by picking and choosing among competing inferences which may be drawn from the record. For example, the majority notes that the name change sought by the respondent mother "look[s] suspiciously like an attempt to anger the [petitioner]." If fact-finding were the proper role of this Court, which it is not, I would make note of an entirely different inference: that the petitioner's last-minute attempt to get current on his child support looks suspiciously like an attempt to bring himself within the quid pro quo rule of *Harris*.

_____

[9]"We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children." *Sheppard v. Speir*, 157 S.W.3d 583, 588 (Ark. Ct. App. 2004).

The trend in other jurisdictions is away from *Harris*-like rules and presumptions, as "many courts have held that neither parent has a superior right in the determination of the surname for the parents' child." *In re Andrews*, 454 N.W.2d 488, 491-92 (Neb. 1990) (collecting cases). As explained by the Supreme Court of Ohio in *In re Willhite*, 706 N.E.2d 778 (Ohio 1999),

> '[m]ost scholars agree * * * that the patrilineal system evolved from the medieval property system * * *, [in which] men were the heads of households and owned all property contained in the household, including rights to their wives and children.' Kennedy-Sjodin, 41 S.D.L.Rev. at 175.[10] 'The trend toward paternal surnames was accelerated by Henry VIII, who required recordation of legitimate births in the name of the father. Thence, the naming of children after the fathers became the custom in England,' and the tradition continued in the colonies. Schiffman, 28 Cal.3d at 643, 169 Cal.Rptr. at 920, 620 P.2d at 581. Through the advent of the Married Women's Property Acts, no-fault divorce, and gender-neutral custody statutes, today the rationale for the preference for paternal surname has disappeared. *Id*.

706 N.E.2d at 780 (footnote added).

Significantly, as one examines the analytical basis of *Harris* (which I have previously called "payment of child support = naming rights"), the court in *Willhite* also noted that

> [u]nder the *Newcomb*[11] test, as well as tradition, a child's surname has been a sort of quid pro quo for the father's financial

---

[10]Shannon J. Kennedy-Sjodin, *Keegan v. Gudahl: The Child's Surname as a New Bargaining Chip in the Game of Divorce*, 41 S.D. L. Rev. 166 (1996).

[11]*In re Newcomb*, 472 N.E.2d 1142 (Ohio Ct. App. 1984).

13

support. We find that this ignores the mother's parallel duty to support the child whether or not she is the residential parent. Further, it 'reinforce[s] the child-as-chattel mentality by making the child's name a piece of property to be bargained over. Indeed, it rewards the father for doing that which he is already legally, if not morally, required to do. Clearly, the notion of equating the best interest of the child with dollars is no longer reasonable in contemporary society.

*Id*. at 781 (footnote added and internal citations omitted).

Following the modern trend,[12] the *Willhite* court listed the following factors to be considered in a name change case:

[T]he effect of the change on the preservation and development of the child's relationship with each parent; the identification of the child as part of a family unit; the length of time that the child has used a surname; the preference of the child if the child is of sufficient maturity to express a meaningful preference; whether the child's surname is different from the surname of the child's residential parent; the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's; parental failure to maintain contact with and support the child; and any other factor relevant to the child's best interest.

*Id*. at 782.

---

[12]*E.g.*, *C.B. v. B.W.*, 985 N.E.2d 340, 343 (Ind. Ct. App. 2013); *In re T.G.-S.L.*, 2013 WL 43738, at *3 (Tex. App.2013); *M.R.H. v. J.N.P.*, 385 S.W.3d 494, 498 (Mo. Ct. App. 2012); *Robertson v. D'Amico*, 2012 WL 833102, at *2 (Cal. Ct. App., 2012); *Eberhardt*, 83 A.D.3d at 123-24, 920 N.Y.S.2d at 221; *Andrews*, 454 N.W.2d at 492-93; *Sheppard v. Speir*, 157 S.W.3d 583, 590 (Ark. Ct. App. 2004); *In re C.R.C.*, 819 A.2d 558, 560-61 (Pa. Super. 2003). *See also* 65 C.J.S. *Names* § 24 (2010) (collecting cases).

In my view, the approach outlined in *Willhite* is one that should be adopted by this Court. Our precedents may dutifully recite that the cases turn on the best interests of the children, but the fact is that the decisions in *Harris*, *Lufft* and *Carter* are inextricably linked to the parents' rights. In *Harris*, we determined that virtually all rights belong to the father, so long as he's paying child support; in *Lufft*, we acknowledged (without saying it directly) that no, some fathers are so bad they don't really deserve those rights; and in *Carter*, we went right back to *Harris* and reaffirmed that a father who pays child support – no matter how minimal, no matter that he hadn't bothered to contact his child for 13½ years, and no matter what the wishes of his child might be – maintains his "naming rights."

Only in *Ashworth* did we eschew any discussion of rights and quid pro quo entitlements; rather, we dispassionately reviewed the circuit court's judgment under an abuse of discretion standard. In the instant case, however, it appears that this Court has gone back to the rules, presumptions and impossibly high evidentiary standards established in *Harris*, *Lufft* and *Carter*, reversing a well-reasoned decision by a circuit judge who heard the evidence and determined that the respondent mother's request for her child to have a hyphenated surname was in the child's best interests. In so doing, I believe that this Court has failed to do justice in this case. Further, with our decision in this case we have perpetuated a system whereby a child's surname is a quid pro quo for the father's legally mandated financial support – a "child-as-chattel" exchange, *Willhite*, 706 N.E.2d at 781 –

15

even where the custodial parent seeks only to add his or her name by hyphenation, not to eliminate the other parent's name. The court below properly treated both child support and hyphenation as factors to be considered, nothing more and nothing less. "[W]here the mother is merely seeking to add her last name and not to eliminate the father's name, the fact that the father supports the child should not preclude the proposed change." *Eberhardt*, 83 A.D.3d at 123, 920 N.Y.S.2d at 220.

For these reasons, I respectfully dissent.