708 S.E.2d 461

**In the Matter of the Petition of CAREY L.B. for the Adoption of Johanna C.D., Grant Thomas D. and Jameson Todd D., Children Under the Age of Twelve Years.**

No. 34218.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 3, 2009.

Decided June 22, 2009.

David Allen Barnette, Laurie K. Miller, Vivian H. Basdekis, Jackson Kelly PLLC, Charleston, WV, Attorneys for Appellant.

Edward L. Bullman, Charleston, WV, Attorney for Appellee.

**PER CURIAM:**

This case is before this Court upon appeal of the final order of the Circuit Court of Kanawha County entered April 3, 2008. In that order the circuit court denied the petition of Carey L. B.[1] to adopt the children of his wife, Jamie A.B. and her former husband, Mark D. In this appeal the adoptive father contends that the circuit court erred by denying the adoption. Based upon the record before this Court, the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court finds that the circuit court erred in its finding that the biological father had not abandoned his children and reverses the decision below.

## I.

### FACTS

Carey L. B.(hereinafter referred to as the "adoptive father" or appellant), is the hus-band of Jamie A.B. (hereinafter referred to as the "mother"). Jamie A.B. is the biological mother of three children; to-wit: Johanna Caroline D, born January 21, 1996; Grant Thomas D., born December 5, 2000; and Jameson Todd D., born September 12, 2003. Mark D. (hereinafter referred to as the "biological father") is the children's biological father.

On August 10, 2007, the appellant filed a verified Petition in the Circuit Court of Kanawha County to adopt the aforenamed children. The children's mother's consent to the adoption is not at issue as she joined in her husband's petition.[2] The biological father's consent was not given to this adoption.[3]

Because of the biological father's lack of consent to this adoption, the adoptive father proceeded on a theory of abandonment. The adoptive father alleged in his petition as follows: "... Mr. [D.] has failed to financially support the minor children since April of 2006, and has not visited with the children for a period of more than six months." The adoptive father also averred that adoption of the children was in their best interests.

The biological father and mother were married to each other on August 6, 1988, and separated on January 2, 2003. By order of the Circuit Court of Columbia County, Arkansas, the mother was divorced from the biological father on ground of indignities.[4] In its final order of May 19, 2004, the mother was granted custody of the three children.

When the mother and biological father separated, the oldest child, Johanna C.D. was

---

1. Consistent with our past practice in juvenile and domestic relations cases which involve sensitive facts, we use initials in place of the last names of the parties. *In the Matter of Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

2. Paragraph 4 of the verified petition for adoption states that the mother "... joins petitioner in his petition for the adoption of her minor children."

3. Parental consent is required in many adoption cases. West Virginia Code § 48–22–301(b)(3) states as follows:
   Consent or relinquishment shall not be required of a parent or of any other person having custody of the adoptive child ... who,

in a stepparent adoption, is the birth parent or adoptive parent of the child and is married to the petitioning adoptive parent. In such stepparent adoption, the parent must assent to the adoption by joining as a party to the petition for adoption.

4. Arkansas Code Annotated § 9–12–30(b)(3) states as follows:
   ... The circuit court shall have power to dissolve and set aside a marriage contract, not only from bed and board, but from the bonds of matrimony, for the following causes:
   ... (3) When either party shall:
   ... (C) Offer such indignities to the person of the other as shall render his or her condition intolerable.

six years of age and her brother Grant T.D. was two years of age. At the time of the separation, the mother was pregnant with the youngest child, Jameson T. D., who was born approximately eight months later.

At the time of the divorce, the biological father was employed as an auditor for the State of Arkansas and earned approximately $60,000 per year. While the final order does not state her occupation, the mother was earning approximately $27,000 per year, an amount that was expected to increase to $35,000 per year. Child support was established by the May 19, 2004, order at the weekly sum of $245. The mother's claim for alimony was denied.

During the pendency of their divorce, the biological father relocated from Columbia County, Arkansas, to Mississippi County, Arkansas, estimated by the biological father to be 330 miles apart. The final order granted the biological father visitation with the children on a schedule promulgated by the court. The visitation schedule was amended by order of the Columbia County Circuit Court on February 14, 2005.[5] At the time of the filing of the adoption petition in Kanawha County in August of 2007, the biological father was entitled to monthly visitation with the children and extended weeks during the summer school vacations.

Shortly after the divorce was effective, the mother married the adoptive father in Columbia County, Arkansas, on December 31, 2004. In July of 2005, the mother, adoptive father and children moved to West Virginia in support of the adoptive father's new job.

The biological father likewise remarried after the divorce from the mother, and he and his second wife continued to live in Mississippi County, Arkansas. On December 12, 2005, his second wife gave birth to a child. Tragically and unexpectedly, the biological father's wife died the next day because of delivery complications. It was at this time that the biological father stated he had no choice but to cease working so that he could take care of his infant daughter. At or about this same time the biological father began abusing prescription drugs. His drug use led to criminal proceedings in two states.[6]

In December of 2006, the biological father entered into drug rehabilitation. At the hearing on the petition for adoption, the biological father stated that he borrowed money from his family members to pay the approximate $10,000.00 cost for the treatment.

The biological father admitted that he had not paid child support for some period of time. The following exchange occurred between the biological father and his attorney:

Q. Why didn't you pay any child support since 2006?

A. When I had the ability to pay, I paid. It's not like I don't plan on if I ever get back on my feet again, financially to make that right because it is something that if the Court says I have to pay, then I obviously have to pay. We can sit there and look at the circumstances on what actually took place and have an adjustment made. Right now, there has not been one and I

---

5. The amended visitation order of February 14, 2005, stated, *inter alia:*

The defendant will not have alternate weekend visits with the children because twenty hours a month in a car spent by not only children of these ages, but the parents, is an ordeal that the Court does not think is good for anybody so the Court will continue the Defendant's one weekend per month visitation. In addition the Defendant [biological father] shall have each Spring Break.

... The Court orders that the Summer visits of the Defendant are extended by one week which would be in the case of the two younger children there would be one 3 week visit and one 2 week visit and with regard to the oldest child it would be one 4 week visit and one 3 week visit.

6. At the hearing in this matter, the appellee stated that he was the same person named in a pending Tennessee criminal proceeding. The appellee was facing one charge of probation violation for a prior drug-related misdemeanor and three additional charges of being in violation of Tenn.Code Ann. §§ 53–11–402(a)(3) (1990) and 39–16–302 (1989). In addition, at the time of the hearing the appellee was facing a seventy-three amended information in the Circuit Court of Mississippi County, Arkansas, for violations of Ark.Code Ann. § 5–64–403 (2005) (use of fraud to acquire or obtain possession of a controlled substance). The Arkansas charges allege offenses from a period of January, 2006, to August, 2008.

fully intend to pay that when I get back on my feet.

Q. When do you think that's going to be?

A. Hopefully, when I can get all of these issues behind me and I can start working and have gainful employment.

It is undisputed that the arrearage in child support was $19,100.00 as of the hearing on December 18, 2007. It is likewise agreed that the biological father's last payment of child support was on June 15, 2006.

Neither party disputes that the last time the biological father saw the children was in October, 2006. The adoptive father asserts that since that time, there has been no contact between the biological father and the children. The biological father responded that he attempted to telephone the children and to send letters but got no response. When asked about the contact with the children, the biological father explained as follows:

Q. Why didn't you—you knew when you were going to rehab. They just didn't come one night and cart you off to rehab; correct?

A. That is correct.

Q. Why didn't you write your kids, call your kids, say look, Daddy's going to be out of pocket for awhile. He's going to try to go get better or whatever?

A. Well, this was the first part of December, which just a couple of weeks prior to that, I was refused to be able to even see my kids. They weren't going to show up. They weren't going to allow me to talk to them on the phone. It's really one of those conversations you want to be able to sit down with your kids and talk to them about. Not that you want to write down on a paper and let somebody else either totally throw it away or tell them, something different about what's going on in their dad's life. It's something I wanted to communicate personally to my children and I never got the chance to.

On the issue of the children's best interests, the adoptive father presented the testimony of a licensed social worker who performed a home study.[7] This witness testified that she visited the home of the adoptive father and mother. The witness' duties included checking the adoptive father and mother's references, reviewing their financial situation to see if they could afford to support the children and performing a background check on the adoptive father. She also interviewed the oldest child, Johanna, who informed the witness that she had very little memory of her biological father. The child informed the social worker that she did not remember the last time she had seen her biological father. The social worker further stated that Johanna referred to the adoptive father as her dad during their discussions. The social worker also observed the other two children in the home. She ultimately recommended and testified that the adoptive father should be allowed to adopt the children.

The petitioner also presented the deposition testimony of Dr. Russell Volten. M.D., a psychiatrist who evaluated the adoptive father, mother and the children. Dr. Volten testified that the children had expressed a desire to be adopted by the adoptive father, who was already acting as a psychological parent to the children.[8] Dr.

7. Unless waived by the circuit court, a home study is required after the filing of an adoption petition. West Virginia Code § 48–22–701(b) states that the court shall

... cause a discreet inquiry to be made to determine whether such child is a proper subject for adoption and whether the home of the petitioner or petitioners is a suitable home for such child. Any such inquiry, if directed, shall be made by any suitable and discreet person not related to either the persons previously entitled to parental rights or the adoptive parents, or by an agency designated by the court,

or judge thereof, and the results thereof shall be submitted to the court or judge thereof prior to or upon the hearing on the petition and shall be filed with the records of the proceeding and become a part thereof.

8. Although not dispositive to our resolution of this case, we have previously defined the term as follows: "A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's

Volten opined that the adoption would be in the children's best interests.[9]

By order entered April 3, 2008, the circuit court denied the petition for adoption. The circuit court found as follows:

1. Mark [D] is the biological father of the minor children named in the instant proceeding. He does not consent to the adoption of his children by the Petitioner.

2. Mr. [D] has filed a petition to modify a custody order entered in Arkansas against his former wife, the mother of the children and now the wife of the petitioner. At the time of the filing of the instant petition, that petition to modify was pending in the Arkansas court.

3. Mr. [D] is currently unemployed. He was admitted to drug rehabilitation form (sic) December 6, 2006, until August 15, 2007. The cost of the inpatient rehabilitation was $10,000 for the first 90 days.

4. Mr. [D] is under indictment in Arkansas for 73 counts of prescription forgery. He is also charged with violation of probation for three counts of attempting to obtain narcotics in Tennessee and was place (sic) on pretrial diversion from December 23006(sic) until October 30, 2007.

5. Mr. [D] last saw his children during his October 2006 visitation.

6. Mr. [D] testified that in November 2006, the Petitioner, Carey L. B., told him he could not see or visit with his children.

7. Mr. [D] testified that he attempted at least on (sic) time per month to contact the children by telephone while he was hospitalized for drug rehabilitation and the phone calls went unanswered. He testified that on at least one occasion when he called to speak with the children, the Petitioner told him never to call again and hung up the telephone.

8. Mr. [D] testified that he sent letters to the children and the sending [of] letters to them was also a part of his drug rehabilitation program. He received no response. He testified his last letter to the children was sent in July 2007.

9. Mr. [D] did not present in documentary evidence to support his attempt to [con]tact his children by letter or telephone.

10. The Petitioner denies ever hiding the children from Mr. [D] or denying visitation. He testified that he has given Mr. [D] his home phone number and cell[u]ar phone number.

11. On the issues of attempting to contact the children and interfering with contacting the children, the Court did not find any one witness more credible than the other.

12. Mr. [D] testified that he has not paid child support because he has been unemployed and unable to pay since May 2006. He was hospitalized in a drug rehabilitation program from December 2006 until August 2007. Mr. [D] testified he successfully completed the drug rehabilitation program and is now seeking employment in order to satisfy his child support obligations.

13. The Petitioner testified that he is the sole source of monetary support for his wife and her children. He has never been convicted of any crime nor does he have any addictions to controlled substances.

emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified." Syllabus point 3, *In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005).

9. Counsel for the parties deposed Dr. Volten on December 14, 2007. Dr. Volten testified that the adoption would be in the children's best interests "based on the stability it would provide and the children's own desire for this to happen."

14. Jamie [A. B.], the biological mother of the children testified that Mr. [D] has been ordered to pay child support in the amount of $245 weekly, and that he is $19,000 in arrears. She and Mr. [D] were divorced of (sic) Order of the Circuit Court of Columbia County, Arkansas, entered December 1, 2004. She and the Petitioner were married December 31, 2004.

15. Both of the [petitioners] testified that Mr. [D] has failed to financially support the children since April 2006 and has made no effort to visit with the children for more than 6 months. Both deny any interference with contact between Mr. [D] and his children and both testified that they believed it was in the best interest of the children for the Court to grant the adoption.

The circuit court concluded that the standard of proof necessary to terminate the biological father's parental rights was clear, cogent and convincing evidence. The circuit court also concluded that while the biological father had not provided child support, there were reasons for this lapse. The order stated, *inter alia*

> ... [H]is addictions, problems with the law, and hospitalization for drug rehabilitation has likely been a major factor in hindering him from doing so, not any intent or settled purpose to forgo (sic) his parental duties or relinquish all parental claims to the children.

The lower court's order also concluded that the adoptive father "had failed to show unrebutted conduct on the part of the biological father presumptively constituting abandonment as defined by W. Va.Code § 48–22–306." Conversely, the lower court found the biological father had presented evidence of "compelling circumstances preventing him from supporting, visiting or otherwise communications (sic) with his children," and cited W. Va.Code § 48–22–306(d). Finally the circuit court concluded that based upon the record, it could not find intent on the part of the biological father to abandon his children.

It is from the circuit court's April 3, 2008, order denying his petition for adoption that the adoptive father and the mother now appeal.

## II.

### STANDARD OF REVIEW

We have explained that our standard of review is as follows: "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syllabus Point 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996).

## III.

### DISCUSSION

At issue in this appeal before us is whether the circuit court below erred in denying the adoptive father's petition seeking adoption. Specifically, we must consider whether the adoptive father presented sufficient evidence below to invoke a statutory presumption of abandonment and if so, whether the biological father rebutted this presumption.

We begin our analysis with the premise that a biological parent has a right to the custody of his or her child. In the Syllabus to *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798 (1969), we stated that:

> A parent has the natural right to the custody of his or her infant child and, unless the parent in an unfit person because of misconduct, neglect, immorality, abandonment, or such other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.

*In accord,* Syllabus Point 2, *Hammack v. Wise,* 158 W.Va. 343, 211 S.E.2d 118 (1975). While there may be situations where the welfare of the child and the biological parents are in conflict, "there is a strong presumption that the welfare of the child is well protected when he is in the custody of an unoffending

natural parent." *Honaker v. Burnside,* 182 W.Va. 448, 451, 388 S.E.2d 322, 324 (1989), *citing Hammack,* 158 W.Va. at 347, 211 S.E.2d at 121.

■ However, as stated in *State ex rel. Kiger,* abandonment of a child voids the presumption that a biological parent is fit to have custody of his or her child. This Court has defined abandonment as "any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Matter of Adoption of Schoffstall,* 179 W.Va. 350, 352, 368 S.E.2d 720, 722 (1988) (citations omitted). West Virginia Code § 48–22–102 (2001) defines abandonment as "any conduct by the birth mother, legal father, determined father, outsider father, unknown father or putative father that demonstrates a settled purpose to forego all duties and relinquish all parental claims to the child."

■ In considering a claim of abandonment, courts may be guided by resort to West Virginia statutory law. West Virginia Code § 48–22–306 (2001) establishes a statutory presumption of abandonment. The statute states, in pertinent part:

(a) Abandonment of a child over the age of six months *shall be presumed* when the birth parent:

(1) Fails to financially support the child within the means of the birth parent; *and*

(2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child: Provided, That such failure to act continues uninterrupted for a period of six months immediately preceding the filing of the adoption petition.

[Emphasis added.] In Syllabus Point 2, *In re Jeffries,* 204 W.Va. 360, 512 S.E.2d 873 (1998), we held:

For a natural parent to avoid the presumption that he or she has abandoned a child who is over the age of 6 months, W. Va. Code § 48–4–3c(a)(1) [1997] [10] requires the parent to financially support the child, within the means of the parent. Furthermore, W. Va.Code § 48–4–3c(a)(2) [1997] requires the parent to visit or otherwise communicate with the child when the parent: (1) knows where the child resides; (2) is physically and financially able to do so; and (3) is not prevented by the person or authorized agency having the care or custody of the child. If there is evidence in a subsequent adoption proceeding that the natural parent has both failed to financially support the child and failed to visit or otherwise communicate with the child in the 6 months preceding the filing of the adoption petition, a circuit court shall presume the child has been abandoned."

The adoptive father herein asserts that he presented sufficient evidence to invoke a statutory presumption of abandonment, as per West Virginia Code § 48–22–306. In the instant case, the adoptive father showed, through competent evidence, that the biological father had not provided child support to the children for a period in excess of six months. Indeed, the record reflects that the biological father last paid child support on June 15, 2006. The adoptive father also proved that child support obligation of the father was in arrears in an approximate amount of $19,000.00. Since the biological father's monthly child support payment was established at the weekly sum of $245.00, we observe that the biological father's arrears appeared to have been greatly in excess of six months.

■ Mere non-payment of child support is not enough to invoke the presumption contained in W. Va.Code § 48–22–306. The adoptive father must also show that the biological father failed to support the children within the biological father's means and abilities. The adoptive father was able to show at the hearing that prior to the divorce between the mother and biological father, the

**10.** In 2001, the West Virginia Legislature renumbered, reordered and recodified the domestic relations code. While the section is renumbered and now appears as West Virginia Code § 48–22–306 (2001), it is not significantly changed.

biological father was earning approximately $60,000.00 as an employee of the State of Arkansas and was a college graduate. The record further shows that after the biological father's divorce from the mother, he became mired in substance abuse, resulting in numerous arrests and other nightmarish consequences of his addiction. His entry into a long-term residential treatment shows an attempt to free himself of the chains of drug addiction. However, some of his choices indicate that while he was in treatment, he put other needs ahead of his children's financial support. Specifically, the record indicates that during the same period in excess of six months prior to the petition for adoption being filed in which no child support was paid and an arrearage in support accumulated in excess of $19,000.00, the biological father incurred and serviced an obligation to purchase a car, got married and was supported by his spouse, arranged for family members to pay for his medical expenses and was able to come up with the $10,000 required for drug rehabilitation treatment. All of this occurred while the children were not being financially supported by their biological father.

▮ Notwithstanding the lack of financial support of his children, W. Va.Code § 48–22–306(a)(2) also requires that the biological father has failed to visit or otherwise communicate with his children within the six months prior to the filing of the adoption petition. On the issue of whether the biological father visited with the children, and most importantly within the six-month period prior to the filing of adoption petition on August 10, 2007, the adoptive father showed at the hearing that the last physical interaction between the biological father and the children was October of 2006. This time is undisputed. Other contact, including telephone calls, letters or cards, was non-existent. The record amply demonstrates that the biological father failed to expend even minimal effort to note important occasions in his children's lives, such as the sending of a birthday card.

▮ We conclude that the evidence adduced at the hearing by the adoptive father clearly and convincingly invoked the presumption of abandonment defined in W. Va. Code § 48–22–306, and as such, the burden of persuasion to rebut the presumed abandonment shifted to the biological father. West Virginia Code § 48–22–306(d) states in pertinent part that "notwithstanding any provision in this section to the contrary, any birth parent shall have the opportunity to demonstrate to the court the existence of compelling circumstances preventing said parent from supporting, visiting or otherwise communicating with the child[.]" Also, "the standard of proof required to support a court order limiting or terminating parental right to custody of minor children is clear, cogent and convincing proof." See Syllabus Point 6, *In Re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

The trial court seems to have improperly applied the burden of persuasion of rebuttal to the adoptive father by concluding in the final order that "[t]he Petitioner has failed to show unrebutted conduct on the part of the biological father presumptively constituting abandonment." The circuit court's findings seem to indicate a misunderstanding in two areas: first, that the obligation of the adoptive father is to show unrebutted conduct on the part of the biological father; and second, that once the presumption of abandonment is invoked, the biological father must rebut that presumption. We believe the requirement imposed by the lower court shows a misinterpretation of the statutory presumption. It is incumbent upon the biological father to rebut the presumption of abandonment once the presumption has been triggered.

Having reviewed the entire record before us, we conclude that clear, cogent and convincing proof exists in the record that the biological father has wholly failed to provide financial support for his children, and that the biological father failed, for a continuous period in excess of the six months preceding the filing of the adoption petition, to visit or otherwise communicate with his children when he knew where the children were, was not physically or financially prevented from doing so, and was not prevented by the mother from doing so. As such, the circuit court erred when it found that the biological father had not abandoned his children.

On the issue of the children's best interests, the adoptive father presented the testi-

276

mony of a social worker who performed a home study as well as the testimony of a psychiatrist. Both supported the adoption of the children by the appellant. The record, therefore, has been largely developed and simply awaits the circuit court's findings and conclusions in the final order of adoption. While the final order in this matter did not address whether the proposed adoption was in the best interests of the children, we find that there was sufficient evidence contained in the record to conclude that this adoption does further the children's best interests. As such, this case must be remanded to the lower court for prompt resolution of this case by ordering forthwith the adoption of the children by the adoptive father.

## IV.

### CONCLUSION

For the reasons set forth herein, the April 3, 2008, final order of the Circuit Court of Kanawha County is reversed, and this matter is remanded for further proceedings not inconsistent with this opinion. The Clerk is directed to immediately issue the mandate in this matter.

**Reversed and Remanded.**