IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

**April 18, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 11-1492

JOSHUA D.R. AND SHERRIE L.R.,
Petitioners Below, Petitioners

v.

DAVID A.M.,
Respondent Below, Respondent

Appeal from the Circuit Court of Marion County
Honorable Larry V. Starcher, Special Judge
Civil Action No. 11-A-13

REVERSED AND REMANDED

Submitted: March 26, 2013
Filed: April 18, 2013

Amber Urtso Sellaro, Esq.                    J. Douglas Crane, Esq.
Sal Sellaro Culpepper Legal Group, PLLC      J. Douglas Crane, L.C.
Morgantown, West Virginia                    Morgantown, West Virginia
Attorney for Petitioners                     Attorney for Respondent

The Opinion of the Court was delivered PER CURIAM.

**SYLLABUS BY THE COURT**

1. "'In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.' Syllabus point 2, *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997)." Syl. Pt. 1, *In re the Adoption of Jon L.*, 218 W.Va. 489, 625 S.E.2d 251 (2005).

2. "The standard of proof required to support a court order limiting or terminating parental rights to custody of minor children is clear, cogent and convincing proof." Syl. Pt. 6, *In Re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

3. "'In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.' Syllabus Point 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973)." Syl. Pt. 2, *Lindsie D.L. v. Richard W.S.*, 214 W.Va. 750, 591 S.E.2d 308 (2003).

i

4. "Although parents have substantial rights that must be protected, the primary goal . . . in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

5. "'A parent has the natural right to the custody of his or her infant child and unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.' Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969)." Syl. Pt. 1, *In re Carey L.B.*, 227 W.Va. 267, 708 S.E.2d 461 (2009).

6. "'For a natural parent to avoid the presumption that he or she has abandoned a child who is over the age of 6 months, W.Va. Code § 48–4–3c(a)(1) [1997] requires the parent to financially support the child, within the means of the parent. Furthermore, W.Va. Code § 48–4–3c(a)(2) [1997] requires the parent to visit or otherwise communicate with the child when the parent: (1) knows where the child resides; (2) is physically and financially able to do so; and (3) is not prevented by the person or authorized agency having the care or custody of the child. If there is evidence in a subsequent adoption proceeding that the natural parent has both failed to financially support the child and failed to visit or otherwise

communicate with the child in the 6 months preceding the filing of the adoption petition, a circuit court shall presume the child has been abandoned.' Syllabus Point 2, *In re Jeffries,* 204 W.Va. 360, 512 S.E.2d 873 (1998)." Syl. Pt. 3, *In re Carey L.B.*, 227 W.Va. 267, 708 S.E.2d 461 (2009).

Per Curiam:

This is an appeal from an order of the Circuit Court of Marion County entered September 2, 2011, denying the petition for adoption filed by Joshua D.R. and his wife, Sherrie L.R. wherein Joshua sought to adopt the minor child of Sherrie and her former husband. On appeal, the petitioners argue that the circuit court committed error. Based upon the record, the parties' briefs and the arguments presented, this Court finds that the circuit court erred and abused its discretion in finding that the biological father had not abandoned the child and in denying the adoption.

## I. Factual and Procedural Background

The petitioner, Sherrie L.R. ("the petitioner mother"), and the respondent, David A.M., were married on August 29, 1998. They had one child together, a son, C.M., who was born on October 12, 2000. The parties separated on December 5, 2005, following allegations of domestic violence by the petitioner mother. In January of 2006, upon the referral of C.M.'s pediatrician, the petitioner mother began taking C.M. to see Jeff Collins, a licensed psychologist, for weekly counseling sessions to address C.M.'s emotional and behavioral problems, including his violent and aggressive behaviors toward the petitioner mother.

1

The petitioner mother subsequently filed for divorce and, in an order entered on February 27, 2007, the divorce was granted, in part, on the basis of "cruel or inhuman treatment." Through its order, the family court imposed a fifteen-year injunction against the respondent from molesting or interfering with the petitioner mother, including refraining from contacting her, either in person or by telephone, for "the purpose of harassment or threats[.]"[1] Also, in this divorce order, the petitioner mother was granted primary custody of the child and the respondent was granted supervised visitation "[b]ased upon the testimony of the parties and the child's counselor, Mr. Jeff Collins[.]" Because C.M. had been receiving counseling from Mr. Collins for approximately one year at the time of the final divorce hearing, the family court ordered that the respondent's supervised visitation take place in Mr. Collins's office, "as Mr. Collins shall deem advisable."

On June 15, 2011, the petitioner mother and her husband, petitioner Joshua D.R. ("the petitioner stepfather"),[2] filed a verified petition for adoption in the Circuit Court of Marion County in which the petitioner stepfather sought to adopt C.M. In their petition, they allege that the respondent had neither financially supported nor engaged in any contact with C.M. during the six months preceding the filing of the petition for adoption, although

---

[1]The family court concluded that the lengthy injunction was justified "by the repeated [domestic violence] charges and two (2) convictions of [the respondent] for violations of domestic violence protective orders since the initiation of this [divorce] action."

[2]The petitioners were married on July 10, 2010.

2

he was physically and financially able and had not been prevented from doing so. On or about August 4, 2011, the respondent filed a verified response and objection to the adoption alleging that he was current with his child support payments and that his efforts to maintain contact with his son had been "hindered by persistent interference from the child's mother."

On August 15, 2011, a hearing was held before the circuit court on the adoption petition. Mr. Collins, the licensed psychologist who supervised the visitation between the respondent and C.M., testified that in January 2009, he received a telephone message from the respondent that he was "[n]ot going to be able to make it back anymore [for supervised visitation with C.M.]" and that he was going to "petition the Court about that matter." Indeed, thereafter, no further visitation between the respondent and C.M. occurred at Mr. Collins's office. And, although the respondent advised Mr. Collins that he was going to "petition the Court" about visitation, he never did.

The record contains two letters from Mr. Collins to the family court dated June 9, 2008, and April 23, 2009, respectively, each reporting on the status of both the counseling of C.M. and the supervised visitation between C.M. and the respondent. In the June 9, 2008, letter, Mr. Collins recommended that the respondent: (1) undergo a psychological evaluation to assess the threat of violence and his overall level of functioning; (2) undergo a substance abuse evaluation to address and/or rule out substance abuse issues; and (3) engage in

3

individual therapy to aid him in his role as a parent and with his ability to cope with ongoing

stressors.  Also, in this June 9, 2008, letter, Mr. Collins reported, in part, as follows:

> I am aware of the current allegations that have surfaced which include [the respondent] abusing drugs, acquiring a weapon and threatening to shoot [the petitioner mother] in the face.  I am aware that . . . because of the circumstances that occurred when she received this information, [C.M.] is also aware of this threat.  At this time, [C.M.] is very frightened and terrified that his mother will be harmed by his father.  [C.M.] has voiced these concerns in other sessions as well. . . .
>
> One of the main concerns regarding [the respondent] is the issue of stability.
>
> • • •
>
> In closing, . . . [t]here are many serious issues which need to be addressed which include . . . the threat of physical violence to [the petitioner mother], [C.M.]'s emotional trauma regarding this alleged threat and the allegation of substance abuse. . . .

Mr. Collins's April 23, 2009, letter, which appears to be his final report to the

family court, indicates that although the respondent had continued to request unsupervised

visitation with his son, Mr. Collins did not recommend such visitation because of his

"concerns regarding [the respondent father's] stability" and because the respondent was

unable to complete a list of expectations that he had given to him.[3]  Mr. Collins further

---

[3]The list of recommendations to which Mr. Collins refers is set forth in the June 9, 2008, letter to the family court.

4

reported that his biggest concern regarding visitation was the respondent's instability, which caused C.M.'s level of functioning to decrease.

Mr. Collins testified that between January 2007, when the supervised visitation began, and January 2009, when the respondent reported that he would not be returning for supervised visitation, the respondent appeared for only thirteen supervised visitations with his son. The respondent's last visitation with C.M. at Mr. Collins's office was on September 22, 2008.[4] Mr. Collins expressed his belief that C.M.'s uncertainty as to whether his father was going to appear for visitation led to C.M. feeling "rejected or abandoned," which led to C.M. "feeling sad and ultimately feeling angry as well." Mr. Collins further testified that he saw C.M. approximately one week prior to the adoption hearing at which time C.M. told him that he hoped that the adoption would occur and that he is fearful of his father and does not feel comfortable being alone with him.

Also testifying at the adoption hearing was the respondent, who indicated that he was current on his child support.[5] He further testified that while he loves his son, he had

---

[4]The petitioner mother testified that she thought the last supervised visit was in December of 2008. *See infra* note 16.

[5]Approximately one week prior to the adoption hearing, the respondent paid his child support arrearage in the amount of $2,326.

5

become frustrated with trying to see him because the protective order[6] prevents him from telephoning the petitioner mother or going to her home,[7] and that he was essentially tired or frustrated with the supervised visitations in Mr. Collins's office. Although the respondent testified that the petitioner mother thwarted his attempts to contact C.M. by telephone, Mr. Collins reported in both his letter to the family court dated April 23, 2009, and in his testimony at the adoption hearing, that both he and the petitioner mother had difficulty in getting C.M. to speak with the respondent by telephone.

At the adoption hearing, the respondent also testified that he loves C.M. and that he never wanted to stop seeing him. However, he admitted that he had not seen him for "three-and-a-half, four years." The respondent further testified that since his divorce from the petitioner mother in 2007, he often sent birthday, Christmas, and Valentine's Day cards and gifts to C.M.[8] He also testified that he mailed a gift card to C.M. for Christmas in 2010, but that it was returned to him in the mail. Aside from the respondent's representation in this

---

[6]The respondent father was referring to the fifteen-year injunction imposed against him by the family court in the final divorce order. *See supra* note 1.

[7]The injunction imposed against the respondent in the final divorce decree only prohibits him from contacting the petitioner mother, either in person or by telephone, for the purpose of harassing or threatening her. It does not appear to prohibit contact for other purposes. *See supra* note 1.

[8]The respondent testified that he might have missed two Valentine's Days, maybe a birthday, but he does not think that he missed any Christmases.

regard, he failed to present any evidence that he sent a gift card and that it was returned to him.

During the petitioner mother's testimony at the adoption hearing, she stated that she never saw a gift card from the respondent for C.M. for Christmas 2010, but, if she had received it, she would not have returned it to him.[9] The petitioner mother acknowledged that the respondent had occasionally sent cards and gifts to their son since their divorce and that she had always given those gifts and cards to him, if they were appropriate.[10] The petitioner mother explained that on one occasion, the respondent sent a package to C.M. with "his wallet and belongings in it with a suicide letter[.]" When asked to explain what C.M.'s current thoughts or opinions were concerning his father, the petitioner mother testified that C.M. is "scared of his dad from our past living together and things that have happened[.]"[11]

---

[9]The petitioner mother also testified that she did not know the respondent's address to mail a gift card back to him and, in fact, she had to obtain his address through his probation officer for the purpose of serving him with the petition for adoption.

[10]The petitioner mother testified that even if she did not physically give an inappropriate card to C.M. from the respondent, she would still tell him that his father had sent him a card.

[11]The petitioner mother also testified that she "still [has] a relationship with [her] stepchildren, who are "all grown" and that on May 30, 2011, her stepson told her in front of C.M. that the respondent had "grabbed him by the throat for the last time and threw beer bottles at his head," which caused C.M. to fear his father even more.

7

C.M.'s guardian ad litem ("guardian") filed an answer in the circuit court in which she reported that C.M. had infrequent contact with his biological father and had not seen him in "quite a long time." The guardian further reported that C.M. wants very much to be adopted by his stepfather, whom she describes as a "very positive role model" for C.M. The guardian expressed her opinion that the respondent's parental rights should be terminated and that C.M. should be adopted by the petitioner stepfather because,

> [f]or all intents and purposes, [the respondent] has abandoned [C.M.] and does not exercise his parental rights. I[t] is clearly not in the infant's best interest to allow [the respondent] to remain as the infant's legal parent. [C.M.] deserves to have an interested and loving father, and that person would be [the petitioner stepfather].

On September 2, 2011, the circuit court entered an order denying the adoption petition on the grounds that the respondent was current on his child support payments[12] and had made "minimum contact" with the child, including gifts for his birthday, Christmas and Valentine's Day, such that the court could not find abandonment.

---

[12]As indicated above, the respondent paid his child support arrearage approximately one week prior to the adoption hearing. Prior to that payment, the record reflects that the last child support payment made by the respondent was December 7, 2010, which appears to have been an automatic withholding made by the Bureau for Child Support Enforcement.

## II. Standard of Review

We are asked to review a circuit court's order entered upon a petition for adoption. Our standard of review in this regard is well established:

> "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syllabus point 2, *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

Syl. Pt. 1, *In re the Adoption of Jon L.*, 218 W.Va. 489, 625 S.E.2d 251 (2005).

## III. Discussion

In this appeal, we are asked to determine whether the circuit court abused its discretion by determining that the respondent had not abandoned C.M. and by denying the petition for adoption filed by the petitioners. The petitioners assert that this matter is governed by West Virginia Code § 48-22-306(a) (2009), which sets forth a presumption of abandonment where there is no financial support of the child and no visitation or contact with the child during the six months immediately preceding the filing of the petition for adoption. The petitioners argue that the evidence demonstrated that, during the six-month period immediately preceding the filing of their petition for adoption on June 15, 2011, the respondent failed to financially support C.M. and failed to visit or communicate with him. The petitioners argue that the circuit court failed to apply this statutory six-month period to

9

its analysis of whether the respondent had abandoned C.M. *See* W. Va. Code § 48-22-306(a). The petitioners also argue that although the circuit court appointed a guardian ad litem for C.M., it did not fully consider the guardian's opinion that the adoption should be granted nor did it refer to the guardian's opinion in its order.

In his summary response to this Court, the respondent asserts that the circuit court correctly denied the petition for adoption because the mere nonpayment of child support is not enough to invoke the statutory presumption of abandonment. The respondent argues that as of the hearing on the petition for adoption, he was no longer in arrears on his child support, therefore, the petitioners could not show that he was not financially supporting his child. The respondent adds that he mailed a gift card to C.M. for Christmas of 2010, but that it was returned to him in the mail, presumably, he argues, by the petitioner mother. He also asserts that the circuit court acknowledged that the guardian was present for the adoption hearing and that it had received her answer that was filed with the court.

In determining whether the circuit court abused its discretion in denying the petition for adoption, we must first consider whether the petitioners presented sufficient evidence below to invoke the statutory presumption of abandonment set forth in West Virginia Code § 48-22-306(a) and, if so, whether the respondent presented sufficient evidence to rebut that presumption. In this regard, we note that "[t]he standard of proof

required to support a court order limiting or terminating parental rights to custody of minor children is clear, cogent and convincing proof." Syl. Pt. 6, *In Re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

We begin our analysis with the premise that a biological parent has a right to custody of his or her child. As we have previously explained,

> "[i]n the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syllabus Point 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

Syl. Pt. 2, *Lindsie D.L. v. Richard W.S.*, 214 W.Va. 750, 591 S.E.2d 308 (2003). However, the right of a natural parent to the custody of his or her infant child must also be balanced against the welfare of the child. "Although parents have substantial rights that must be protected, the primary goal . . . in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). Indeed,

> "[a] parent has the natural right to the custody of his or her infant child and unless the parent is an unfit person because of misconduct, neglect, immorality, *abandonment* or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the

11

courts."  Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969).

Syl. Pt. 1, *In re Carey L.B.*, 227 W.Va. 267, 708 S.E.2d 461 (2009) (emphasis added).


In the case *sub judice*, the petitioners maintain that the respondent has abandoned C.M.  The Legislature has defined "abandonment" as "any conduct by the birth mother, legal father, determined father, outsider father, unknown father or putative father that demonstrates a settled purpose to forego all duties and relinquish all claims to the child." W.Va. Code § 48-22-102 (2009).  Similarly, in *Carey L.B.*, we stated that "[t]his Court has defined abandonment as 'any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.' *Matter of Adoption of Schoffstall*, 179 W.Va. 350, 352, 368 S.E.2d 720, 722 (1988) (citations omitted)." *Carey L.B.*, 227 W.Va. at 274, 708 S.E.2d at 468.  Further, as referenced above, there is a statutory presumption of abandonment of a child over the age of six months under West Virginia Code § 48-22-306, which provides, in pertinent part, as follows:

> (a) Abandonment of a child over the age of six months shall be presumed when the birth parent:
>
> (1) Fails to financially support the child within the means of the birth parent; and
>
> (2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child: Provided, That such failure to act continues

12

uninterrupted for a period of six months immediately preceding the filing of the adoption petition.

• • •

(d) Notwithstanding any provision in this section to the contrary, any birth parent shall have the opportunity to demonstrate to the court the existence of compelling circumstances preventing said parent from supporting, visiting or otherwise communicating with the child[.]

These statutory provisions have been echoed and applied in prior decisions of this Court:

"For a natural parent to avoid the presumption that he or she has abandoned a child who is over the age of 6 months, W.Va. Code § 48–4–3c(a)(1) [1997] requires the parent to financially support the child, within the means of the parent. Furthermore, W.Va. Code § 48–4–3c(a)(2) [1997] requires the parent to visit or otherwise communicate with the child when the parent: (1) knows where the child resides; (2) is physically and financially able to do so; and (3) is not prevented by the person or authorized agency having the care or custody of the child. If there is evidence in a subsequent adoption proceeding that the natural parent has both failed to financially support the child and failed to visit or otherwise communicate with the child in the 6 months preceding the filing of the adoption petition, a circuit court shall presume the child has been abandoned." Syllabus Point 2, *In re Jeffries,* 204 W.Va. 360, 512 S.E.2d 873 (1998).[13]

Syl. Pt. 3, *Carey L.B.*, 227 W.Va. 267, 708 S.E.2d 461 (footnote added).  With these principles in mind, we turn to the evidence in the case at bar.

---

[13]In 2001, the Legislature recodified and renumbered the domestic relations statutes such that West Virginia Code § 48-4-3c, as cited *Carey L.B.*, is currently West Virginia Code § 48-22-306.

The record reflects that the petitioners demonstrated through clear, convincing, and cogent evidence that the respondent had not provided child support for his son during the six months preceding the filing of the petition for adoption. In fact, as previously noted, it was not until one week prior to the adoption hearing that the respondent made a payment in the amount of $2,326 to the Bureau for Child Support Enforcement, which covered his child support arrearage. Given that the child support obligation was established at $101 per month, we observe that the respondent's arrearage appears to have been greatly in excess of six months. Moreover, the payment of the arrearage nearly two months after the petition for adoption was filed does not meet the relevant inquiry as established by the Legislature, which is whether the respondent provided financial support during the six months immediately *preceding* the filing of the petition for adoption.[14] Because the respondent did not financially support his son during the applicable six-month time period, the petitioners have satisfied the first of the two statutory requirements for abandonment. W.Va. Code § 48-22-306(a)(1).

We now consider the second statutory factor for abandonment of a child by a parent: the failure to "visit or otherwise communicate with the child." W.Va. Code § 48-22-306(a)(2). The respondent testified at the adoption hearing that he had not seen his son C.M. in three and a half to four years. According to Mr. Collins's testimony, supervised visitation between the respondent and C.M. began in January 2007, and the last supervised visitation

---

[14]*See supra* West Virginia Code § 48-22-306(a).

occurred on September 22, 2008.[15] He further testified that during this time frame, the respondent appeared for visitation with his son only thirteen times, which led to C.M. feeling "rejected or abandoned." Mr. Collins also testified that in January 2009, the respondent advised him that he would not be returning for any further supervised visitation and that he was going to petition the court about visitation. It is undisputed that the respondent never sought to modify the terms of his visitation with his son.

It is clear from the record and the argument before this Court that the respondent resides in the same general vicinity as his son and that he was neither physically nor financially prevented from seeing him. The respondent's testimony that the petitioner mother somehow hindered his visitation efforts is inconsistent with the uncontroverted evidence that he voluntarily chose to terminate supervised visitation. Thereafter, his only contact with C.M. was an occasional card or gift.[16] Regrettably, and as indicated previously,

---

[15]The petitioner mother testified at this hearing that she thought the last supervised visit was around Christmas of 2008. Whether September or December of 2008, the respondent's last physical interaction with C.M. occurred well outside the statutory six-month period for purposes of determining abandonment by a parent. *See* W.Va. Code § 48-22-306(a).

[16]We are mindful of an earlier decision of this Court wherein the abandonment of a child is described as where the parent "does not visit the children, and does not in any other reasonable way, given his position in life and the opportunities for the exercise of his parental rights, exercise the authority or undertake the responsibilities of a parent . . . ." *In re Harris*, 160 W.Va. 422, 428, 236 S.E.2d 426, 430 (1977). While *In re Harris* involved a divorced mother's request to change the surname of her child where the child's father was still living, our description of abandonment therein seemingly contemplates that parenting requires more

(continued...)

15

even those limited communications were, at times, inappropriate, such as the package containing a suicide letter that the respondent sent to C.M. Nonetheless, the respondent cites *Carey L.B.* for his argument that his occasional gifts and cards demonstrate that he did not abandon his son. In *Carey L.B.*, we stated that:

> [o]n the issue of whether the biological father visited with the children, and *most importantly within the six-month period prior to the filing of adoption petition* . . . contact, including telephone calls, letters or cards, was non-existent. The record amply demonstrates that the biological father failed to expend even minimal effort to note important occasions in his children's lives, such as the sending of a birthday card.

*Carey L.B.*, 227 W.Va. at 267, 708 S.E.2d at 470. (Emphasis added). In the case at bar, looking "most importantly" to the six months prior to the filing of the adoption petition, the only contact the respondent arguably had with C.M. was the respondent's testimony that he allegedly mailed a gift card to C.M. for Christmas in 2010. *Id.* The respondent's representation that the petitioner mother mailed the gift card back to him is not corroborated by any evidence of record. Moreover, the petitioner mother testified that she neither saw nor returned a gift card.

Based on the foregoing, we conclude that clear, cogent, and convincing evidence exists in the record that the respondent has failed to financially support, visit or

[16](...continued)
than an occasional card or gift.

otherwise communicate with C.M. for a continuous six-month period preceding the filing of the adoption petition, although he knew where his son lived, was not physically or financially prevented from seeing his son, and was not prevented from doing so by the petitioner mother. *See* Syl. Pt. 3, *Carey L.B.*, 227 W.Va. 267, 708 S.E.2d 461. Thus, under West Virginia Code § 48-22-306, abandonment is presumed and the burden shifted to the respondent to rebut that presumption by demonstrating the existence of "compelling circumstances preventing said parent from supporting, visiting or otherwise communicating with the child[.]" W.Va. Code § 48-22-306(d).

We further find that the respondent failed to rebut the presumption of abandonment. His payment of his child support arrearage after the petition for adoption was filed in no way proves that he provided financial support for C.M. during the six months preceding the filing of the petition for adoption. To the contrary, it proves otherwise. Further, his allegation that he mailed a gift card to C.M. for Christmas 2010 was wholly insufficient to overcome the presumption of abandonment, particularly given his voluntary termination of the supervised visitation with his son. Accordingly, we find that the circuit court abused its discretion in its ultimate disposition finding that the respondent had not abandoned C.M.

Because we find from the record that it is in the best interest of C.M. to be adopted by Joshua, his stepfather,[17] we remand this case to the circuit court for prompt resolution through the entry of an order granting the petition for adoption pursuant to West Virginia Code § 48-22-701(d).[18]

## IV. Conclusion

For the reasons set forth herein, the circuit court's September 2, 2011, order is reversed and this action is remanded to the circuit court for further proceedings consistent with this opinion.

Reversed and Remanded With Directions.

---

[17]West Virginia Code § 48-22-701(a) (2009) provides, in part, that the court shall decree the adoption if "(4) . . . it is in the best interests of the child to order such adoption." We conclude that the adoption is in the best interest of C.M. based on the evidence in the record.

[18]In this regard, we note that West Virginia Code § 48-22-701(d) provides, in part, as follows:

> [T]he court or judge thereof shall make an order reciting the facts proved and the name by which the child shall thereafter be known, and declaring and adjudging that from the date of such order, the rights, duties, privileges and relations, theretofore existing between the child and those persons previously entitled to parental rights, shall be in all respects at an end . . . .

18